Margaret R. O'BRIEN, Plaintiff,

v.

Arthur S. FLEMMING, Secretary of Health, Education and Welfare, United States of America, Defendant.

Civ. No. 2644.

United States District Court
S. D. Illinois, S. D.

Nov. 18, 1959.

388

Richard W. Husted and Carbary & Carbary, Elgin, Ill., for plaintiff.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., for defendant.

POOS, District Judge.

This case comes to this Court by way of a petition to review a decision of Arthur S. Flemming as Administrator of the Social Security Act, which decision denied claimant, Margaret R. O'Brien, old-age insurance benefits under Title II of the Social Security Act as amended, 42 U.S.C.A. § 401 et seq. The Referee and the Appeals Council denied the allegation for benefits, thereby leaving the findings and determinations of the Referee, as agent for the Secretary, in full force and effect.

The provisions of Section 205(g) of the Act, 42 U.S.C.A. § 405, gives this Court jurisdiction to hear and determine the review; and subdivision (g), among other things, provides:

" * * * The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * * "

This requires an examination of the record to determine whether or not the findings are supported by substantial evidence, and on such examination and study of the record the Court must arrive at its ultimate judgment.

The Referee states the issue to be:

"The general issue in this case is whether or not Claimant is entitled to Old Age Insurance Benefits and the specific issues are whether or not Claimant was an employee of Leo from January 1955 until September 7, 1956. If she was such an employee, the question is whether or not Claimant was paid wages as defined by the Act by the employer amounting to at least $50 in any quarter and if she thereby acquired at least six quarters of coverage." (Record p. 8.)

He defines the touchstone of the case as this:

"* * * whether 'the employer retains the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, "not only what shall be done, but how it shall be done."'" (Record p. 9.)

The issue is properly and correctly stated.

The Referee makes the finding:

"* * * that Claimant received no wages at any time after January 1, 1955, hence acquired no quarters of coverage, and does not have the required quarters of coverage to constitute her a fully insured individual.

"It is the decision of the Referee that Claimant is not entitled to Old Age Insurance Benefits." (Record p. 17.)

Under this finding the power of the Court on this review is limited by Section 205(g) of the Act as above quoted to affirm this finding "if supported by substantial evidence." Thus the Court is required, under the law, to minutely examine this record to determine if there is substantial evidence to support this finding of fact. The corollary to this is that conclusions on factual issues, which are not supported by the facts in the record or by inferences justifiably drawn therefrom, can be disregarded by the Court. Also the Court is not required to consider erroneous application of the law to the facts.

The burden is upon claimant to prove her claim.

A thorough examination of the transcript shows that on October 12, 1956, claimant, Margaret R. O'Brien, then 67 years of age, made application for old-age insurance benefits under Title II of the Social Security Act as amended. On January 8, 1957, this claim was denied, and a request for a hearing was filed April 15, 1957. Hearing on said request was conducted at Peoria, Illinois, on June 20, 1958, at which claimant, together with her representative, appeared and produced evidence in support of claimant's position. The Referee ruled, on September 25, 1958, that claimant was not entitled to old-age insurance benefits because there was no true employer-employee relationship in existence. Claimant filed a request for review of the Referee's decision by the Appeals Council on November 25, 1958, and such request was denied February 13, 1959. Pursuant to the provisions of Section 205(g) of the Social Security Act, as amended, Section 405(g), Title 42 U.S.C.A., on April 14, 1959, claimant filed with this Court a petition for review of the Administrator's decision.

Claimant lived in her home on North Sixth Street in the City of Springfield, Illinois, which she purchased in 1921 by warranty deed from William R. and Louise West. Record p. 134. Her mother, Elizabeth O'Brien, and her sister, Rose O'Brien, lived with her. Until the latter part of 1954 claimant managed and cared for the household, prepared the meals for the three of them, and generally performed the work essential to the maintenance of a home. Rose was employed, and for many years paid $120 monthly for the operation of the home, and for claimant's own maintenance in exchange for claimant's services, and for the living which she received in claimant's home.

Claimant's mother had been under the care of a physician for many years prior to 1954, and from time to time it had been necessary to take her mother to the hospital, and at other times to have nurses come to the home to care for her. Her brother, James Leo O'Brien, who lives in Jacksonville, Illinois, where he operates a shoe store, had always paid his mother's hospital bills, doctor bills, and bills for nurses who had performed nursing services in the home for the mother. The necessity for hospitalization and nursing services was sporadic, and had not been regular over the years. In November and December of 1954, claimant's mother's condition became

considerably worse so that it was apparent that either she would need special nurses again or would be placed in a hospital or nursing home. She was then 93 years of age. The mother preferred to remain at home and have such nurses as were necessary.

The mother complained of the treatment she received from the nurses who were brought in, and often screamed with pain when being turned or lifted by such nurses. The brother, Leo, decided he would have to get new and better nurses and stated to claimant that he did not care how much it cost. One evening late in December 1954, claimant and Leo went to the grocery store and upon leaving they discussed their mother's situation in the car. Claimant stated that if Leo was willing to pay anybody, she would like to try the job herself, and asked that she be given a trial; that she knew she could do the job. Discussion followed and Leo said that if she could do it, it would be all right. He inquired whether claimant could lift their mother. Claimant said that she was sure she could, and asked again that she be given a trial. Leo said that he would give her the job on trial for a period of two months, and would pay her $50 per week, and that if their mother didn't get along, or that claimant was not up to the job, he would "do otherwise".

After Leo and claimant returned from the store, Leo told Rose that he and claimant had talked the situation over and that claimant would start doing the nursing work that their mother required, and would continue to do so as long as claimant could do the work in the manner Leo expected. On January 1, 1955, Leo told claimant that if she was not able to stand up under this work that he would tell her and let her go and bring in somebody else.

Rose and Leo said this discussion took place while Leo and claimant were at the store, and that Leo later informed her of it. Claimant said it took place at home with Rose present. In any event, there is no dispute that a contract was entered into between the brother, Leo, and the claimant to take care of the mother. The brother, Leo, was no part of the family except that the relationship of mother and son and brother and sister existed. He was not living in the home. It is pointed out above that the home was owned by claimant. He lived at Jacksonville, Illinois, where he was engaged in the retail shoe business. The record plainly indicates that he was willing to pay the cost of any nursing services, whether it be rendered by a nurse or any other person, and concluded to hire claimant for that purpose.

Claimant, after her employment, had her bed moved from her room upstairs to her mother's room on the first floor, and thereafter lived in that room until her mother died. Her duties consisted of fixing her mother's heating pad, giving her her medicines on their regular schedule, cooking her food and feeding her, lifting and turning her, changing her bedding several times daily, keeping a chart of her daily temperature, pulse, medicines, doctor's visits, her general condition, giving her massages and rubs day and night. The charts on the mother's condition were not offered in evidence, but as to keeping them, the medical doctor, Leon Lando, substantiated the fact that they were kept.

Prior to this time claimant's activities were confined to taking care of the house and involved little or no nursing services to her mother. When such services were necessary prior to this time, outside nurses were brought in. After undertaking the care of her mother, claimant no longer did any of the household work. Leo told her that he didn't care about the household work; that he wanted the mother taken care of and that claimant was to do anything and everything that could be done for their mother, and that claimant was to obey the doctor's orders and carry out his recommendations, and was to notify Leo immediately if there was any change in the mother's condition.

Prior to the worsening of the mother's condition in late 1954, Leo came to Springfield to see his mother every

Thursday and Sunday. After his mother's condition worsened and claimant undertook caring for her, Leo came over more often and telephoned on those days he could not get to Springfield. On these visits, Leo would check with the mother as to what kind of treatment she was getting from claimant, talk to claimant about how she was handling the job, and would take claimant's sister, Rose, aside to talk to her about claimant's care of their mother. Leo examined the chart and checked to see if bedding was changed regularly and medicine given on schedule. Claimant stated that she found out that her brother was checking on her pretty thoroughly. Leo also often checked with the doctor as to the nursing treatment their mother was receiving from claimant. The doctor told claimant that if she did not do a good job of caring for her mother he was to report it to Leo.

According to the doctor and her mother, claimant was giving better service and attention than had any of the nurses who had been brought in before to care for the mother. Claimant was on the job 24 hours a day, and seldom left the house. During period claimant was recovering from a broken wrist, nurses were brought in to care for her mother. This period was for seven weeks, from March 29, 1955, after which time she resumed her full duties. The record shows that she was paid her salary during this period.

Claimant stated that she felt that she was to take orders from her brother, Leo, and did take orders from him.

For many years prior to 1955, Leo gave his mother from $100 to $200 a year for personal expenses. He also paid his mother's medical and doctor bills. The money he gave to and paid for the benefit of his mother amounted to approximately $300 to $400 per year. Whenever his mother required nurses, Leo paid their wages. He never contributed money to the support of the household, nor did he ever pay any medical expenses of his sisters.

Claimant's starting salary of $50 per week, later raised to $60 per week, was paid quarterly by check from January 1, 1955, until their mother's death in September 1956. This is not disputed, nor is it disputed that the Social Security tax was paid. Prior to 1955 Rose claimed claimant as a dependent, but discontinued doing so in 1955 and thereafter.

Leo had no written contract of employment with claimant, but he did not have written contracts of employment with his employees in his shoe store either.

In a domestic service questionnaire filled out by claimant in October, 1956, claimant answered the question: "Did any one have the right to instruct the wage earner as to how to perform the services", in the negative, and stated she knew what to do. On objection to this question and answer, claimant's attorney stated that he did not believe that claimant knew the difference between receiving instructions and the right to instruct, and that claimant was apparently talking about the latter part of the employment term during which she had become thoroughly familiar with what was expected of her. Counsel also objected to the statement in the questionnaire that claimant did domestic work since she did no domestic work at all after undertaking the constant care of her mother. This objection was overruled. Irrespective of whether or not this action was proper, the fact remains that no domestic work was performed by claimant after she undertook the employment of nursing and caring for her mother, and the further fact, under this record, in reference to the answer to the question in the manner in which it was answered, is that the answer in no wise can be construed as implying that Leo ever forgave his right to instruct. This record shows that he carefully checked many times to see that claimant did the job. He did this by personal inspection of his mother's bedding, checking the charts, and verifying with the doctor and his sister, Rose, the fact that claimant at all times performed the services. See Record pages 40, 41, 42, 43, 44, 45, 50, 69, 71, 79, 80, 81, 91, 92, 96, 98, 99, 100, 102, 103, 105.

The Referee stated the following:

"At the hearing Claimant objected to the introduction in evidence of Exhibit 7 'Domestic Service Questionnaire' signed by James Leo O'Brien, October 24, 1956. Said Exhibit is received in evidence and is considered in connection with the other evidence in the record."

This exhibit insofar as pertinent, is as follows:

"(1) Describe the services performed by the wage-earner: Ans: Acted as nurse for our invalid mother.

"(2a) What agreement or working arrangement did the employer make with the wage-earner and when was it made? Ans: In December of 1954, naturally in a case of this kind the agreement would be verbal.

"(3a) How many days a week and hours a day did the wage-earner work? Ans: Seven days a week and was on hand night as well as day, if and when needed.

"(3b) Did the employer require the wage-earner to work during specific hours? Ans: Yes. Explain ans: My mother was an invalid and needed care not only during the daytime, but often during the night.

"(4) Did any one have the right to instruct the wage-earner as to how to perform the services? Ans: Yes. If 'Yes', who had such right? Ans: She needed no instructions or advice.

"(5a) Were any instructions actually given to the wage-earner as to how to perform the services? Ans: No.

"(5b) Who gave the instructions? Ans: Her duties were definitely understood. She was given wonderful care, and needed no instructions or suggestions.

"(6a) Could the employer dismiss the wage-earner? Ans: Yes. If 'Yes', for what reasons? Ans: If my mother had been neglected, which was not only unlikely but beyond the realm of probability.

"(7a) Was the wage-earner paid cash for services? Ans: Yes, by checks only.

"(7b) What was the pay arrangement? Ans: By checks only.

"(7c) Is the pay arrangement still in effect? Ans: No.

"(7d) Did the wage-earner use any of this case to help pay the employer's household expenses such as rent, repair of property, groceries, etc? Ans: No.

"(8) Did the employer furnish board or lodging or anything else in addition to cash wages? Ans: No.

"(9) Do you have any evidence as to wages paid, such as cancelled checks, receipts, etc? Ans: Yes.

"(10) Has the wage-earner filed an income tax return reporting any wages received from this employer? Ans: Yes.

"(11a) Has the employer or any one in his immediate family claimed the wage-earner as a dependent for Federal or State Income Tax purposes in the past ten years? Ans: Yes.

"(11b) Give the years for which any such was made and by whom? Ans: By her sister, Rose O'Brien, in years prior to 1955.

"(11c) Give reasons for claiming the wage-earner as a dependent. Ans: She was staying home without any salary, and was dependent.

"(12) Did employer file social security returns when they were due, reporting the cash wages paid for the wage-earner? Ans: Yes.

"(13) Give the total number of persons living in the employer's household. Ans: Three. Employer did not live in household where services were performed.

"(14a) Did a domestic work in the household before the wage-earner began to perform the services? Ans: Yes, practical nurses and registered nurses at times.

"(14b) Did the employer or any one else help the wage-earner perform domestic services in the household? Ans: No.

"(14c) Give the names (including the employer's) of such other persons and

kind of work performed by each. Ans: Registered and practical nurses were employed at times; these persons filed self-employment tax as self-employed persons.

"(15) How is the wage-earner related to the employer? Ans: Sister.

"(16) Who owned or rented the residence where the services were performed? Ans: Sister. Other sister, Rose, who was employed outside home, paid household expenses.

"(17a) Where did the wage-earner live during the period the services were performed? Ans: At home, in the same house as our invalid mother.

"(17b) If the wage-earner lived with the employer, give the date the wage-earner first began to do so. Ans: No, she did not. Employer lived in Jacksonville.

"(18a) Did the wage-earner perform any services for the employer before 1951 or before the present employment period? Ans: No.

"(18b) Give the date on which the wage-earner performed services for the employer. Ans: January 1, 1955.

"(18c) What services were performed, and what was the pay arrangement? Ans: Nursing, paid quarterly by check.

"(19a) Has the work relationship between the employer and the wage-earner ended? Ans: Yes, on September 10, 1956, by reason of the death on September 7, 1956, of the patient who was my mother.

"(20) Has the wage-earner performed household services for any one other than this employer? Ans: No.

"(21) Has the wage-earner performed other types of work as an employee or self-employed person in the past ten years? Ans: No.

"(22) Explain why W/E was hired to perform the services. Ans: Beginning about January 1, 1955, my mother's condition had reached a point where she required full time care. It was very unfair for one member of the family to do everything without reasonable compensation. Had she not done all of this work I would have had to hire three practical nurses to work 'around the clock' and even then she would not have received the good care that she did from my sister. Signed, James Leo O'Brien."

■■ This was a proper exhibit, and it shows, beyond question, when tied in with the other evidence, that a contract was entered into about Christmas of 1954, between claimant and Leo O'Brien and the findings of the Referee when considered in the light of the testimony of Leo (Record p. 75), Margaret, the claimant, (Record p. 36), and Rose, (Record p. 94), that a contract of employment was not entered into in contemplation of Section 210(k)(2) of the Act is a conclusion which has no support whatever in this record. The evidence given by Leo, who resided at Jacksonville, some $37\frac{1}{2}$ miles from claimant's house in Springfield, definitely shows that he was not a resident in and member of the so-called "family home"; that he always paid his mother's doctor and hospital bills; that his mother lived with his sisters (Record p. 76); that he didn't support the household at all; that he made no contributions to his two sisters; that he always saw to it that his mother had ready cash and that the gifts to his mother, which totalled from $300 to $400 per year, was her spending money; that it was necessary at times to have nurses for her; that starting in 1954 she had a kidney spell requiring nurses whose services were paid for by him (Record p. 77); that no other member of the family contributed to the payment of nursing services; that in the latter part of 1954 his mother's health deteriorated rapidly, and she needed constant care; that during this time he paid a woman $35 a week to be there at night; that in the latter part of 1954 he had a conversation with Margaret, the claimant, concerning outside nurses to take care of his mother; that claimant related from experience that sometimes the nurses could not handle

her, causing her to scream (Record p. 79); that he also knew this because of hearing his mother scream himself when handled by nurses that he determined to get someone to take care of her, irrespective of expense; that Margaret said she could do the job better than any of the nurses; that he thereupon discussed the pros and cons of the case, and as a result of the conversation he started with claimant on a trial basis for services around the clock; that Margaret moved her bed from upstairs down into the bedroom beside her mother; that his mother required attention from rubbing her back and neck to having coffee made for her in the early morning hours; that he observed claimant do this; that his mother, on his checks with her, would say, "I had her up last night at this time and at that time"; that he asked her, "Do you want someone else here", to which she replied, "No, just so long as we don't kill Marge. The others all hurt me." That he checked with the doctor who said, "Marge is doing a wonderful job if she can hold up physically. Your mother is getting better service by Margaret taking care of her than three nurses could give" (Record p. 79); that he checked frequently with his younger sister and his mother to find out if she was satisfied; that the only complaint she made was one in which she wanted her hair combed twice a day; that in reference to giving directions to claimant he checked with his mother as to whether or not she was getting proper attention, and he talked to Margaret, the claimant, and told her that she didn't have to do it all, that he could hire more help; that Margaret was the type of person who needed no supervision in looking after her mother (Record p. 80); that he checked on claimant's work with Rose and Dr. Lando, the mother's doctor; that at the commencement of the employment in December, 1954, claimant was told that she could start out on a trial basis; that her service must be satisfactory to his mother and himself and that if she couldn't do the work he would call in someone else whether claimant liked it or not; that she was to be paid $50 per week and that outside of attending Sunday Mass she would be there 24 hours per day; that he checked with Rose to see that she was there doing the job; that for her services he paid her by check quarterly (Record p. 81). At this time cancelled and paid checks for the quarters ending March 31, 1955, June 30, 1955, October 1, 1955, Dec. 31, 1955, March 31, 1956, June 30, 1956 and Sept. 7, 1956, in the respective amounts of $624, $624, $624, $624, $780, $764.40 and $588, all signed by Leo O'Brien on his shoe store account under the trade name Edwin Smart were admitted in evidence without objection. This was the trade name under which he ran his business. Record pp. 131, 132 and 133. Also admitted in evidence was his check showing the payment by Leo of his mother's funeral expense (Record p. 131). The oral contract of employment was definitely completed about Christmas of 1954 (Record p. 90). Leo was the employer and claimant was the employee and wage-earner.

I have purposely set forth his evidence in great detail. It is corroborated by the sister, Rose (Record pp. 94 to 108), and by claimant (Record pp. 36 to 75). At the time of the hearing claimant was 67 years of age, the mother at the time of her death was 94 years old, and Rose was 45 years old. The age of Leo was 62 years. The evidence in the record, i. e., his income tax returns, shows that at no time did he claim either his mother, his sister, Rose, or claimant as dependents, and the concern for the health and well-being of his mother is definitely reflected in this record. The record further reflects that he not only hired his sister, the claimant, to look after his mother on a round-the-clock basis, but also that he paid her for it. The record further shows that the hiring at first was on a trial basis; that he definitely determined by personal inspection, by conversations with his mother, his sister, Rose, and Dr. Lando, the attending physician, that claimant was capable and did do the job by hard work, understanding and devotion to her employment.

The Referee, in reaching his conclusion, (Record p. 15) says:

"*(With Respect to Raising Claimant's Compensation)*

"(Exhibit 28, page 9): Claimant states:

" 'He (Leo) testified further that he was so well pleased with the mother's care in the hands of Margaret that on January 1, 1956 he raised Margaret's wages to $60 per week without her asking for an increase and paid that sum until the termination of the employment on September 10, 1956 * * *.'

"The only testimony by Leo on this matter is:

"Counsel: How much was she to be paid, was there a definite agreement?

"Leo: Yes, $50 a week.

&ast; &ast; &ast; &ast; &ast; &ast;

"Counsel: By what means was your sister paid for this employment?

"Leo: Check, quarterly. I would always pay her for she didn't get out of the house.

&ast; &ast; &ast; &ast; &ast; &ast;

"Referee: What was she to be compensated?

"Leo: $50 a week and I gave her that for the first year.

"Referee: $50—when was she to be paid?

"Leo: Quarterly.

"Leo did *not* testify that he at any time raised Claimant's wages."

This Court takes the meaning of this to be that the claimant was not worthy of belief in this testimony. Yet when you review this record, the record discloses that the period of employment as to the period of increased wages was from January 1, 1956 to September 7, 1956, a period of 249 days. Divide this by 7, the number of days in a week, and you arrive at 35.5 weeks. The record further discloses that the total payments for this period was $2,132.40 (Record p. 12).

Divide this sum by 35.5, the number of weeks involved, and the result is $60.06. This figure, in my opinion, corroborates the testimony of claimant, that she truthfully said that her brother voluntarily raised her wages. Thus the Referee was wrong on this conclusion of fact.

The Referee finds that Rose, a sister, had been working for 25 years as a secretary and that she contributed to claimant and the mother the sum of $120 monthly for many years, and that she claimed the claimant and the mother as dependents on her income tax return prior to 1955. The fact as previously related is that claimant owned the home in which the mother and sister, Rose, resided. Under this state of the record she had a legal right to so claim her mother and the claimant as her dependents for income tax purposes. Nevertheless the record shows that for the years 1955 and 1956 she ceased to claim the claimant as her dependent, and that for these years claimant filed her own income tax returns, reporting for the year 1955 the sum of $2,500, and for the year 1956 the sum of $2,160 as income received by her which she testified was income from her specific employment. This testimony is corroborated by her income tax returns and the social security tax payments.

The Referee used the above facts in reaching his final conclusion that there was no contract of employment within the provisions of the Social Security Act. The question for him to determine was whether or not there was a contract of employment completely executed between claimant and Leo. The fact that Rose ceased claiming her sister as a dependent, and the further fact that claimant filed her own income tax returns and paid the tax thereon for the years in question, in the light of the facts in this record, tends to corroborate that there was an employment contract, not to militate against it.

Particular attention is directed to pages 11 and 12 of the record where the Referee cites the record in support of his conclusions, and emphasizes the facts that,

"On April 27, 1955, three days after Claimant (then incapacitated from performing *any* nurse-like duties) applied for a Social Security Account number (Exhibit 2), Leo drew a check payable to Claimant (Exhibit 11) in amount of $624. This was the first payment of alleged wages to Claimant although she alleges she entered into the employment relationship with Leo as her employer on January 1, 1955, approximately five months before said check was drawn. Exhibit 11 was drawn approximately one month after Claimant became incapacitated for nurse-like activities. (Exhibit 9). This check (Exhibit 11) was endorsed by Claimant and paid by the bank May 3, 1955. Thereafter Claimant received similar checks from Leo (in evidence as indicated below) in the following amounts, dates and dates of payment by the bank:

| Exhibit | Date of Check | Amount | Date of Payment by Bank |
|---|---|---|---|
| 12 | July 29, 1955 | $624 | August 9, 1955 |
| 13 | October 28, 1955 | $624 | November 8, 1955 |
| 14 | December 31, 1955 | $624 | January 24, 1956 |
| 15 | March 31, 1956 | $780 | May 29, 1956 |
| 16 | June 30, 1956 | $764.40 | September 25, 1956 |
| 17 | September 21, 1956 | $588 | September 26, 1956 |

"It is the contention of Claimant and the testimony of Leo that these checks (Exhibits 11 to 17 inclusive) represented wages paid to Claimant by Leo for nursing care rendered by Claimant to Leo's mother, Mrs. Elizabeth O'Brien, during a term of employment commencing January 1, 1955 and terminating with the death of Mrs. Elizabeth O'Brien which occurred on September 7, 1956.

"From all the evidence the Referee finds that the family household (composed of Claimant, Mrs. Elizabeth O'Brien and Rose) during the period January 1, 1955 to and including the date of death of Mrs. Elizabeth O'Brien, September 7, 1956, had income for its support of $120 per month received from Rose and the sum of the above described checks (Exhibit 11 to 17 inclusive) a total of ($4628.40, contributed by Leo + $2400, contributed by Rose =) $7028.40. This approximated $350 a month for the time, January 1, 1955 to September 7, 1956, the date of death of Mrs. Elizabeth O'Brien.

"The Referee finds that in addition to this income to the household during the above time Leo paid for practical nurses, which were employed in said household for a period commencing March 29, 1955 and extending into the summer of 1955. (Exhibit 9). The Referee also finds that in addition Leo paid for the services of physician in attendance on Mrs. Elizabeth O'Brien and that he paid the funeral expenses resulting from her death (Exhibits 18 and 19).

"The Referee finds on all the evidence that the approximate $350 per month, considering the mother being bedridden, Claimant incapacitated for several weeks or months (Exhibit 9) and Leo's contributions for physician's and nurse's fees, to have been reasonable expense for the household under the circumstances.

"The Referee believes and finds that by reason of a family compre-

hension of the history, ailments and age of the mother, and by reason of the single status of the three adult children, the O'Brien family made a common agreement for the support and care of the bedridden mother and for the support of the two daughters who took care of her. Rose, in addition to contributing $120 per month, assumed ordinary housekeeping duties during the last 20 months of her mother's life.

"The evidence with respect to a contract of employment between Claimant and Leo is by testimony of the living members of the family (Claimant, Leo and Rose)."

This Court points out that the conclusions on the facts, as found above, are not justified by the facts disclosed by this record, and that no justifiable inferences can be drawn from the facts that would justify such conclusions. This Court further points out that the only justifiable conclusion that can be drawn from the facts is that a contract of employment was entered into between claimant and Leo on a $50 per week basis for the year 1955, and on a $60 per week basis for the period of January 1, 1956 to September 7, 1956. The Court further finds that the following wages were paid claimant by Leo O'Brien: for the quarter ending March 31, 1955, the amount of wages was $624; for the quarter ending June 30, 1955, $624; for the quarter ending September 30, 1955, $624; for the quarter ending December 31, 1955, $624; for the quarter ending March 30, 1956, $780; for the quarter ending June 30, 1956, $764.40; and for the quarter ending September 30, 1956, $588.

The Court further finds that even though claimant had a broken wrist from April 24, 1955, and for a period of seven weeks thereafter, she earned $50 per quarter for each of the four quarters of 1956 involved, which totals seven quarters. This is all that the law requires.

The Court further finds that there is no evidence in this record that justifies the finding that the services rendered by claimant in aid of her mother resulted from a family conference, and that while Rose was told about it, she was no part of or party to the contract; that Leo O'Brien was not a member of the family or household in which the mother resided; that the contract of employment was entered into by claimant with Leo O'Brien about Christmas time of 1954, and that on January 1, 1955 claimant entered into her employment duties; and that although Margaret was incapacitated from the performance of her full duties for a seven-week period, yet the employer paid her wages for the entire period, and that this was a matter between employer and employee, which should have been of no concern to the Referee in the light of this record; that claimant did apply for a Social Security Account number on April 27, 1955; that she had a legal right to do so; that under the law the employer was required to withhold from her the requisite percentage and pay in addition thereto his requisite percentage, all of which was done and about which there is no dispute in the record, and which is conceded in the record (Exhibit 4, p. 115); that there is no justification for the finding of the Referee that the family made a common agreement for the support and care of the bedridden mother, but that the contract was made between the claimant and Leo O'Brien for the nursing care of the mother; that the payment by Rose of $120 per month was for her own support, the aged mother requiring little for food and support, outside of what was furnished her by Leo; that although Rose did perform some housekeeping duties, the same did not interfere with her own postition as a Secretary, and even though she did these things they were not compensated for by Leo O'Brien, and the record positively shows that he paid nothing for the support of his two sisters; that the finding of the Referee that the contract of employment entered into between claimant and Leo was a part of a common family agreement for the care and support of the two daughters is absolutely without support in this record; that it is true that the evidence of the

contract of employment is supplied by claimant, Rose, Leo and Dr. Lando (Exhibit 9). How otherwise could claimant furnish this evidence? The answer is by those people who knew about it. There is no opposing evidence. Thus she meets the requirement of the burden of proving the contract. The Court further finds that the right to control the performance of the work was at all times vested in James Leo O'Brien and irrespective of any knowledge that claimant had by experience as to the care of her aged mother, this experience only made her more qualified as a laborer in nursing her mother. In any contract of employment, or specifically say as a ditch-digger, does the employer tell the employee how to foot a spade or how to lift a shovel of dirt, or how to bend his back in the movement of carrying out his work, or how to lift a spade of dirt to remove it from the ditch, or how to pile it up on a bank to keep it from falling back into the ditch? Every contract of employment assumes that the laborer has some knowledge of how to perform work. The essence of this contract is that Leo actually saw to it by his own inquiries that the work was properly done, and determined from what he saw that claimant was physically able to do the work. Whether or not the attending physician told her what to do or gave her directions does not militate against a contract of employment. Take for example, the ditch-digger. Say that he meets an obstacle of nature, such as rock that must be removed in digging the ditch, and it becomes necessary to use an explosive to break the rock, and that a foreman shows him how to lay a charge of explosive to accomplish this purpose. Can it be said that the laborer is not an employee or wage-earner? To say otherwise would be to reduce a factual situation to an absurdity. Claimant has met every burden of proving fact, and under the law was a wage-earner as contemplated by the Social Security Act. The law is that the "essential characteristic of the relationship of employer and employee is that the former retains the *right to control* and

direct the individual who performs the services, both as to the result to be accomplished by the work, and as to details and means by which the result is accomplished." Carroll v. Social Security Board, 7 Cir., 128 F.2d 876, 878. Leo O'Brien, in the light of this record, at all times retained this *right*. Not only did he retain this right, but he followed through to see that the details of the work were carried out by claimant. This record is full of the detail of his exercise of this right. The findings of the Referee on this feature are as follows:

"The Referee finds, on all the evidence that the right to control the details of the performance of these services rendered by Claimant was not, at any time, vested in James Leo O'Brien, and that Claimant performed such services with respect to her mother in accordance with Claimant's own knowledge * *."

The effect of this finding is that since claimant performed the services in accordance with her own knowledge, Leo could not have the right to control the details of performance. The fallacy of such thinking is that the two factors, right of control and performance from one's own knowledge, are not incompatible. If the Referee's reasoning were correct, then no one could be a true employee if he had sufficient knowledge to perform his work without continual detailed instructions from the person paying his wages. It also follows from such reasoning that a newly hired individual, having no knowledge of the work to be done, and thus requiring detailed instructions, would be an employee, but as time passes and the employee learns from experience to such an extent that he performs the services from his own knowledge, then at some indeterminable time, the employer-employee relationship dissolved and the individual is no longer an employee, even though he still performs the same work for the same person for the same wages.

This Court has read and studied the cases cited by the Secretary's counsel, as well as others, namely, Thurston v.

Hobby, D.C., 133 F.Supp. 205; McGrew v. Hobby, D.C., 129 F.Supp. 627; Rambin v. Ewing, D.C., 106 F.Supp. 268; Norment v. Hobby, D.C., 124 F.Supp. 489; Rosewall v. Folsom, 7 Cir., 239 F.2d 724; Carqueville v. Flemming, 7 Cir., 263 F.2d 875; Carroll v. Social Security Board, 7 Cir., 128 F.2d 876; Morgan v. Social Security Board, D.C., 45 F.Supp. 349; Murray v. Folsom, D.C., 147 F. Supp. 298; and Irvin v. Hobby, D.C., 131 F.Supp. 851. The factual situations presented in the above cases are in no wise comparable to the factual situations presented in the instant case, and are therefore not controlling.

The findings hereinabove found are adopted as the conclusions of fact and law, and the findings of the Referee and the conclusions based thereon and the affirmance thereof by the Appeals Council are hereby set aside, and the Secretary is hereby directed to enter an order finding that claimant reached the age of 65 on August 3, 1954; that under Section 213(a)(2)(B) of the Act (42 U.S.C.A. § 413(a)(2)(B), claimant comes within its terms of a quarter of coverage in which an individual has been paid $50 or more in wages; that under Section 209 of the Act, claimant had wages paid after 1950 for employment, and that under Section 214(a)(3) of the Act received wages in the amounts hereinabove found for six quarters of coverage, and under Section 210(k)(2) of the Act, 42 U.S.C.A. § 410 (k)(2) was and had the status of an employee of the employer, Leo O'Brien under the common-law rules applicable in determining employer-employee relationship.

It is therefore ordered and adjudged that the findings of the Referee and the affirmance thereof of the Appeals Council be, and the same are hereby set aside and reversed, and the Director is hereby ordered to instate Margaret O'Brien as a person entitled to Old Age Insurance Benefits under the provisions of the Social Security Act in the amounts to be determined in accordance with the scale of the Social Security payments made in her behalf.