Herman L. MILES, Sr., Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, United States of America, Defendant.

Civ. A. No. 4248.

United States District Court
W. D. South Carolina,
Rock Hill Division.

June 16, 1964.

Richard E. Richards, Lancaster, S. C., for plaintiff.

John C. Williams, U. S. Atty. for Western Dist. of South Carolina, and Robert O. DuPre, Asst. U. S. Atty., for defendant.

HEMPHILL, District Judge.

Action brought by plaintiff to review findings and determinations of the Secretary of Health, Education and Welfare as to the disability, and rights to resulting benefits and/or payments, under the provisions of sections 205, 216, 223, and related sections (42 U.S.C.A. §§ 405, 416 and 423) of the Social Security Act. Cross motions for summary judgment precipitate decision on the issue joined, to wit: whether there is substantial evidence in the record to support the Secretary's decision that the plaintiff had failed in his burden of proof to establish his right to a period of disability and the provisions of the Act, supra.

From the hearing examiner's decision, we quote the following:

"The claimant testified that he was born July 1, 1915, that he is five feet, nine inches tall and weighs 153 pounds, which has been his normal

weight for about 15 years. His household consists of the claimant, his wife and one seven-year-old daughter, who was born October 10, 1954. His wife works and they are buying a four-room house located on three lots 25 x 168 feet. The claimant's son drove him to the hearing. The claimant testified that he completed the third grade in school, that in 1930 he went to work in the cotton mill at the age of 14 and has done no other kind of work. After a short period, they moved to Lancaster in 1930 and he went to work in the Springs Mill, where he worked constantly until the time he quit. He worked running speeders and in 1953 they moved him over to the machine shop where he was a mechanic. He assembled stuff and dismantled stuff and did things like that. Sometimes he ran a little drill press. During the last eight years, he worked in the speeder department—he was sort of a mechanic. He was a maintenance man and a section man; he looked after machinery. When he ran speeders, he was making yarn—they call it roping. After eight years looking after the machines, the company put in bigger and heavier machines and cut out probably 60 percent of that department. Since he had worked there for a long time and had a certain amount of seniority, they gave him the other job in place of the one that was cut out. He worked at a table in doing the assembling and dismantling. He sawed with a hack saw, also. He had no formal training as a mechanic or as a machinist. He did not run a lathe or other machines of that type. He has never done any plumbing or carpenter work, never done any brick laying. He has never done anything except work in the mill and then later in the machine shop.

"He was sick in the early part of 1960 and asked for a leave of absence for about eight weeks. When he went back to work they refused to work him, and as of May 30, 1960, they marked "Discharged" on his attendance record. He did not know why they discharged him, except that he was sick and getting a little aggravating to get along with.

"When the claimant began to get sick, his nerves were bad; he got ill; his nose was running; he could not sleep and he would choke and stifle. He had to cough so much he just went all to pieces. He worked just as long as he could seem to go and it began affecting his muscles and he could hardly move. Shortly after he stopped, he went to the State Hospital and stayed there for a month. He had gone to Dr. Renner in about November 1959, he thinks; and he also went to Dr. Crawford. He was in the hospital the latter part of 1959, and in 1960 he was in the State Hospital. He was in the Marion Sims Hospital in November 1959 two different times. Dr. Crawford was treating him for nervousness and tightness across the shoulders and chest. He also complained of fullness after meals and marked tightness in the epigastric region. Both admissions to Marion Sims Hospital were for anxiety state, neurosis, rhinitis and bronchitis. At that time the claimant could not tell exactly what was wrong. He got in such a nervous state, breathing and nervousness; it seemed like anything he ate gave him trouble. The metal dust irritated him and caused his nose to drip and also affected his lungs. The claimant thought that he was about 90 percent worse when he went to work in the machine shop. He went to the State Hospital against his will; but they explained to him that they could do something for him there and he agreed to go. He went back to the mill to get a job but they did not offer to give him a job. They gave no reason why they discharged him. He guessed it was because of the medical report and

they probably figured he was a bad risk. He tried to get a job on the outside of the mill in a store and also tried to get back in the mill.

"The claimant testified that he feels like people look at him and are sort of after him. It is not just exactly like it was at one time. And he also feels people are imposing and making fun of him. He does not have the confidence in himself that he had at one time."

The hearing authority apparently relied upon the testimony of Dr. Frank E. O'Sheal, not the family doctor of the plaintiff. However, on page 109 of the transcript, we find the concluding paragraph of Dr. O'Sheal's report of June 12, 1961, which reads as follows:

"This man appears to me to be in a state of depression, which is probably not as severe as it was at the time of his hospitalization; however, it still appears present. I do not consider that he has had completely adequate treatment for his problem, and it appears to me that this man has potential for rehabilitation."

He was also examined by Dr. R. G. Renner, family physician who certainly would have his history and progress at his fingertips, who diagnosed his difficulty as "reactive depression", his progress as "indefinite", and under remarks (dated January 19, 1961) stated: "I would suggest that the State Hospital be contacted as to this patient's ultimate prognosis."

On March 16, 1961, the plaintiff requested vocational rehabilitation services, which were not productive. On March 17, 1961, Dr. Crawford, his long time family physician, who knew him perhaps as well as anyone else, diagnosed his condition as "marked depression to point of suicidal intention—could not work and complete any job assignments—unable to sleep. Progress 'indefinite'." Later, on June 21, 1961, in an HEW disability determination, Dr. Fuller diagnosed his condition as "psychoneurotic reactions" and "depressive reaction". On February 22, 1962, Dr. Crawford opined, "In my opinion, Mr. Miles is totally and permanenty disabled to continue his occupation as a textile worker". On March 5, 1962, Dr. W. G. Morehouse, Director of the Mental Health Center, York-Chester-Lancaster Counties, stated, "In view of the foregoing, it is my opinion that the diagnosis here is 'Psychoneurosis—Chronic Anxiety State'. At different times, 'depressive' or 'Conversion' features may be more prominent. He has received various tranquillizers without appreciable benefit from his local physicians. It is also my opinion that this man should be classified as 'Totally and Permanently Disabled' because of his psychiatric condition (which is also adversely affected by chronic physical conditions)."

All this, added to the fact that he was given a conditional discharge from the State Hospital, I have considered in connection with this case.

Nowhere does the record show that either the State Hospital or Dr. O'Sheal or any other competent person found that the claimant was not disabled or that he could be rehabilitated. The State Hospital diagnosed the claimant mentally ill and while he did respond somewhat to their treatment, he did not improve enough to be discharged. If he was capable of gainful employment, certainly he would have been discharged.

I believe that on technical medical evidence alone the hearing examiner should not have denied the claim but when socio-economic factors are considered his error becomes all the more clear. The intent of the "disability" legislation was to give considerable weight to these factors as will be seen from the *Report of the Hearings before the Subcommittee on the Administration of the Social Security Law of the Committee on Ways and Means, November 4–13 and December 7, 1959.*

Dr. Hancock, Chairman, Medical Advisory Committee, SSA, was being questioned about a miner whose silicosis pre-

vents continued employment in mines, but who could possibly do other work if it were available, as follows:

"DR. HANCOCK: We are bound by the definition so far as the medical standard is concerned. As I say, the award is not based on the basis of diagnosis but on the basis of disability. I am sure that anyone with silicosis who has gotten to the stage where he is. disabled would comply with these standards.

"Then, also, there is a question of the various socioeconomic factors that come in, based on the man's education, upon the environment where he lives. Those are factors which can be considered by the valuation team, also.

"MR. METCALF: Well, they have not been.

"DR. HANCOCK: Those generally are factors which would liberalize the interpretation.

"MR. METCALF: Those are the factors that I feel should enter into a consideration just as much as the physical disability factor.

"DR. HANCOCK: They very definitely do, sir." P 338.

Mr. Hess of the SSA adds to this line of thought with the following:

"There are problems that arise in many other areas, too. We have the problem of distinguishing between unemployment or inability to find a job that the man can do, and actual incapacity. We try to be realistic about incapacity in the sense that we do not expect these decisions to be, as you say, theoretical. We do not say that a man who has spent his entire lifetime in heavy labor, who has very little education or work experience and therefore very little vocational adaptability, who has a real impairment, that that prevents him from doing the only thing that he is equipped to do. We do not say 'theoretically he can do sedentary jobs because there are some other people who have done that kind of thing all their lives with the same amount of education and training.' " P 347.

■ The above indicates that the Congress intended that factors such as education, work experience and availability of other employment in the vicinity should be given strong consideration. In Bostick v. Folsom, 157 F.Supp. 108, 118 (USDC WD ARK) the law is clearly stated as to the permanency of disability:

"The Act does not require a disability to be permanent. The Act itself, 42 U.S.C.A. § 416(i) (2) (B), provides that a period of disability shall end when the disability ceases or the person attains the age of 65.

"And the Congressional Record demonstrates conclusively that the disability need not be permanent. At page 3730 of Volume 3, U.S.Code Congressional and Administrative News, supra, it is said:

" 'Disability must have lasted for 6 months before it may be considered. This provision is intended to exclude from consideration temporary conditions which terminate within 6 months.

" 'In prescribing that the freeze apply only in the case of impairments 'which can be expected to be of long-continued and indefinite duration' your committee seeks to assure that only long-lasting impairments are covered. This provision is not inconsistent with efforts toward rehabilitation since it refers only to the duration of the impairment and does not require a prediction of continued inability to work.' "

■ It is apparent that the Congress of the United States would never have placed on the statute books laws providing for disability benefits if it had not been the intention of that legislative body that a person who is entitled should receive. Recognizing that the burden of proof is on the plaintiff, nevertheless, welfare laws, such as the Social Security Act, intend and purpose *inclusion*

*rather than exclusion.* As said in the case of Dean v. Flemming, 180 F.Supp. 553, 556 (U.S.D.C. EDKy), "In the case of Helvering v. Davis, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319, the Supreme Court aptly stated the purpose which Congress had in mind and the object sought to be accomplished by social security legislation. Where the question is a close one the doubt should be liberally construed in favor of the claimant. Carroll v. Social Security Board, 7 Cir., 128 F.2d 876." Klimaszewski v. Flemming, 176 F.Supp. 927, 932 (U.S.D.C. ED Pa) is authority for the fact that: "The word 'any' must be read in the light of what is reasonably possible, not of what is conceivable. The statute must be given a reasonable interpretation. It is a remedial statute and must be construed liberally. It was not the intention of Congress to impose a test so severe as that required by the Secretary and to exact as a condition precedent to the maintenance of a claim the elimination of every possibility of gainful employment."

The plaintiff does not have to be bedridden to come within the statute. As stated by Chief Judge Sobeloff in Thomas v. Celebrezze (4th Cir.) 331 F.2d 541, decided April 15, 1964, "Certainly it is not necessary that she, or any other claimant, be bedridden to come within the statute's provisions. Neither is she required to sell apples, Adams v. Flemming, 276 F.2d 901 (2d Cir. 1960), nor 'by the use of a catalogue of the nation's industrial occupations * * * go down the list and verbally negative (her) capacity for each of them or their availability to (her) as an actual opportunity for employment.'" Butler v. Flemming, 288 F.2d 591, 595 (5th Cir. 1961); Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Where the statute refers to 'any substantial gainful activity' the word 'any' must be read in light of what is reasonable and not of what is merely conceivable. Klimaszewski v. Flemming, 176 F.Supp. 927, 931–932 (ED Pa 1959).

The claimant is not required to meet every remote possibility which may be conjured up by an active imagination. The availability of the jobs mentioned by the Secretary is at best speculative. We repeat the emphasis recently expressed for this court by Judge Butzner in McDaniel v. Celebrezze, 331 F.2d 426 (4th Cir. 1964), that "reviewing courts must carefully evaluate this type of evidence in determining whether there is substantial evidence in the record taken as a whole to support the decision of the Secretary."

This court finds that the hearing examiner's conclusions are not supported by substantial evidence, but are contrary to and in conflict with the substantial evidence in this case, Hence, it is

Ordered and adjudged, that the decision of the Secretary be, and it hereby is reversed; and it is further

Ordered and adjudged, that the claimant, Herman L. Miles, Sr., be adjudged entitled to benefits under and by virtue of the provisions of sections 205, 216, 223, and related sections, of the Social Security Act as amended, (42 U.S.C.A. §§ 405, 416, 423), together with payment of benefits for such retroactive periods as are by statute allowed.