**James EASTMAN, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.**

**No. C–62–232.**

United States District Court
N. D. Ohio, E. D.
April 2, 1965.

N. C. Syracopoulos, Cherpas, Manos & Syracopoulos, Akron, Ohio, for plaintiff.

Merle McCurdy, U. S. Atty., Harry E. Pickering, Asst. U. S. Atty., Cleveland, Ohio, for defendant.

CONNELL, Chief Judge.

The plaintiff's tortuous path to justice begins on October 24th, 1960, when he filed an application for old age insurance benefits based upon employment by one George A. Giancarli and Donald Eastman in the years 1956 through 1960. The application was disallowed by the Social Security Administration in 1961 on the ground that the alleged employment was excepted from coverage. The claimant instituted a civil action in this District Court and on January 22nd, 1963, Judge McNamee reversed the decision of the Secretary and held that the services alleged to have been performed by the claimant were not excluded from coverage because they were in the employ of his adult stepsons. Since the Appeals Council had raised the question of whether the employment, if any, was in good faith, but had taken no evidence on the question, Judge McNamee remanded this case to the Secretary for further administrative proceedings to resolve the question of bona fides of the employment and the payment of wages. A hearing, at which the claimant and his two stepsons were present and testified, was held before Hearing Examiner Harry B. Kallman on May 9th, 1963, at Columbus, Ohio. Shortly thereafter Mr. Kallman recommended a decision denying coverage for the claimant. On September 30th, 1963, the Appeals Council adopted the recommendations of the Hearing Examiner and denied coverage to the plaintiff.

The plaintiff has again filed a complaint for judicial review of the Secretary's finding and, upon cross-motions for summary judgment, the case is now before us. Our function here, of course, is a limited one. We are not empowered to try the case de novo, but we are only to decide whether the findings of the Secretary are supported by substantial evidence. The mere statement of that rule, however, is not determinative; the question is whether the finding on the entire record is substantially supported. (Rhoads v. Folsom, 252 F.2d 377 (7th Cir. 1958). This question is one of law for the reviewing court to determine upon a considered evaluation of the whole record. Enright v. Celebrezze, 237 F. Supp. 844 (D.C.Mont.1965). And if reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, a court is bound to decide against the Secretary. (Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964); Frazier v. Celebrezze, 236 F.Supp. 938 (E.D.S.C.1965); Freeman v. Celebrezze, 236 F.Supp. 785 (M.D.N.C.1964)).

We state preliminarily, after careful perusal of the voluminous record in this case, that the attitude of the Hearing Examiner and the tenor of the Secretary's brief reflect a predisposition in this case which is wholly inconsonant with the purpose of the statute. This is remedial legislation, to be liberally construed to effect its purpose—to provide

some expectation of security with the advent of age or the threat of infirmity. Cf. McAlister v. Celebrezze, 233 F.Supp. 694 (W.D.S.C.1964). Consequently, the emphasis has always been placed on finding a basis for inclusion rather than exclusion. (Miles v. Celebrezze, 233 F. Supp. 767 (W.D.S.C.1964)).

A careful perusal of the record also discloses an open resentment on the part of the Secretary's administrators to what is described as a collusive arrangement between the claimant and his stepsons to secure coverage. There is no doubt that the alleged employment relationship was specifically designed to qualify Mr. Eastman for benefits under the Social Security Act. There is no impropriety in this. Rhoads v. Folsom, supra; Holland v. Celebrezze, 223 F.Supp. 347 (D.C.Tenn.1963); Brannon v. Ribicoff, 200 F.Supp. 697 (D.C.Mont.1961); Enke v. Ribicoff, 197 F.Supp. 319 (D.C. Fla.1961). As stated by the court in Sabbagha v. Celebrezze, 231 F.Supp. 440, 446 (E.D.S.C.1964):

> "There is no policy of the law which prohibits a person from employing another to perform *even entirely useless services* for the sole purpose of making the employee eligible for social security under this chapter." (Emphasis added)

Although the Hearing Examiner purports to admit that the eligibility-for-benefits motive is proper (Tr. 180), his findings and the Government's brief inferentially dispel the notion that the Secretary followed this rule.

Because of the close family relationship of the parties employer-employee, the Secretary claims that he is entitled to take a long, close look at the alleged employment relationship. This may be true, but it gives him no right to view the case with a jaundiced eye or to ignore the overwhelming weight of the evidence that there was in fact an employment relationship. There is nothing wrong per se with the employment by one relative of another so as to secure Social Security benefits for the latter.

Thus, in Holland v. Celebrezze, supra, the court, in reversing the determination of the Secretary, found no legal impropriety in an arrangement where a sister cared for her brother's child even for nominal compensation so as to qualify her. The court reminded us there that—

> "The terms 'employment' and 'employee' are not to be construed in a strict sense in actions involving remedial legislation, such as here, but in such manner as will accomplish the purposes of that legislation.") 223 F.Supp. p. 350

In the same vein, courts have upheld employment arrangements between a son and mother, Sabbagha v. Celebrezze, supra; son and father, Chipman v. Ribicoff, 196 F.Supp. 94 (D.C.Fla. 1961); and brother and sister, O'Brien v. Flemming, 178 F.Supp. 387 (S.D.Ill. 1959)

Reduced to its simplest terms, the question is merely whether the claimant performed duties for remuneration.

The plaintiff is an Italian immigrant who, after several varied jobs, founded a photography business in 1920. In 1946, plagued by ulcers and general poor health, he retired from the business and sold his equipment to his two nephews, who soon became his stepsons by reason of claimant's marriage to his brother's widow. The two stepsons, Donald Eastman and George Giancarli, operated the studio as a partnership until 1952, when George struck out on other business ventures, including the management of the claimant's real property. George ultimately opened a restaurant and two bars on premises owned by claimant; Donald continued in the photography business on premises owned by the claimant. During these years claimant lived on the rental income from these and other properties whose total value was estimated at $40,000.

In December 1955, the plaintiff alleges that his stepson Donald agreed to hire him to work in the studio at wages of $4200 per year, the maximum creditable income under the Social Security Act, so

that eventually plaintiff would be entitled to maximum old age insurance benefits. (Tr. 154). In 1959 it is alleged that the wages were increased to $4800 a year for the same work because the amendments to the Act had increased the maximum amount of creditable wages to $4800 (Tr. 162). Plaintiff claims that during this period up to the end of June of 1959 he worked from 6 A.M. to noon every day developing and retouching photographs in Donald's studio. After he was laid off by his stepson Donald, he applied to the Ohio Bureau of Unemployment Compensation for unemployment benefits and allegedly sought to secure other employment. At this time he claims that his stepson George hired him as a parking lot attendant at $4800 per year, beginning with the third quarter of 1959. It is further alleged that he tended the parking lot from 5 P.M. to approximately midnight every evening until March 1960, when the income from the parking lot became insufficient to justify the continuance of nightly operation. If these allegations are true, the claimant has amply satisfied the requirements of coverage for the benefits which he seeks.[1]

In denying coverage, the Hearing Examiner found that there was no bona fide employment relationship here. His decision is based on (1) inferences drawn from the tax records, business and personal, of the claimant and his stepsons, (2) his disbelief of their testimony at the hearing and (3) his rejection of the four supporting affidavits offered by the claimant.

■ Of course, a court must accept the inferences of the Examiner provided there is some evidence to support them *or* a lack of evidence to refute them. Fields v. Celebrezze, 218 F.Supp. 334 (E.D.Ky.1963). As stated by the court in Moon v. Celebrezze, 340 F.2d 926, 930 (7th Cir. 1965):

"* * * [C]ourts are limited to a determination of whether the record as a whole contains substantial evidence which supports the administrative decison. They may not resolve conflicts in the evidence. They may not decide questions of credibility. * * *"

The Hearing Examiner sensed a collusive scheme here after perusing the abovementioned tax records. The following chart contains a breakdown of the pertinent information contained in plaintiff's income tax returns for the years 1955 through 1962, showing that plaintiff's total taxable income remained approximately the same during the period of his alleged employment:

| Year | Total Taxable Income | Wages | Rents | Interest |
|------|------|------|------|------|
| 1955 | $11,494.79 | ------ | $10,799.18 | $ 695.61 |
| 1956 | 12,144.29 | $4,200 | 7,344.29 | 600.00 |
| 1957 | 11,974.49 | 4,200 | 6,729.57 | 1,044.92 |
| 1958 | 12,980.25 | 4,200 | 7,804.57 | 975.68 |
| 1959 | 12,545.73 | 4,800 | 6,855.70 | 890.03 |
| 1960 | 10,939.28 | 1,200 | 9,687.63 | 51.65 |
| 1961 | 10,269.66 | 1,200 | 8,881.66 | |
| 1962 | 10,519.77 | 1,200 | 8,297.40 | 458.37 |

Also in evidence are copies of the income tax returns filed by Donald Eastman for the years 1953 through 1962. (Tr. 308–332). Upon examining these

[1]. There is also testimony that the claimant continued to work, after he filed for old age benefits, for his stepson George in a part-time capacity checking the honesty of George's employees. This evidence is immaterial to the main question before us.

returns the Hearing Examiner made the following pertinent observations (Tr. 120):

" * * * These returns indicate that in the year 1955, when Donald's salary expense for his receptionist was only $2,200, he realized a net profit of $2,976.68 from his photography business (Ex. 34). In 1956 his net profit was $2,966.19, after he allegedly paid the claimant $4,200 (Ex. 35). In 1957, after allegedly paying the claimant a salary of $4,200, his own net profit from the business was only $157.81 (Ex. 36). In 1958, after allegedly paying the claimant a salary of $4200, Donald sustained a net operating loss of $1,237.50 for the year from the business (Ex. 37) * * *. During 1959, when Donald allegedly increased the claimant's salary and paid the claimant $2,400 for the first six months, his own net profit for the year was only $420.57 (Ex. 38)."

Because the total taxable income of the plaintiff varied little between years of alleged employment and years of unemployment, and the arrival of income designated as "wages" coincided with a similar reduction in rental income, the Secretary inferred collusion and fraud, and decided that there was in fact no real employment notwithstanding the sworn testimony of seven people to the contrary. It is just as reasonable to infer that the plaintiff was overpaid by sympathetic kin during his years of inactivity and reduced their rents when he was able to work for them. The Secretary makes great import out of the fact that Donald's photography business was barely profitable during the years he allegedly paid the claimant $4200 per year. Therefore, because Donald's business could not stand the strain of the plaintiff's wages, the Hearing Examiner presumed that the plaintiff had not worked for Donald. This circumstance heavily contributed to the Secretary's finding even though he ignored the explanation that the claimant's presence in the studio and the work he accomplished there freed Donald to work for George and thus supplement Donald's income.

■ If the plaintiff did not work, why pay him and whence the wherewithal to pay him? The Hearing Examiner inferred that Donald received a paper payment from George which, in turn, was a paper payment to George from the claimant himself out of the claimant's rental income. Even if this were true, i. e., that the plaintiff indirectly contributed to the fund from which he was paid, this would not per se be unlawful if there is a reasonable basis for the contribution. In the instant case it is uncontroverted that George managed the plaintiff's real property. Why not pay him in excess of $4,000 per year for these services? In the instant case, it is uncontroverted, except by the speculative suspicion in the Hearing Examiner's mind, that Donald helped George manage two bars and a restaurant. Why not pay him $4600 for these services?[2] And how is it possible for Donald to devote so much time to George's business? Because the plaintiff was performing all the time-consuming duties of Donald's business.

■ The Secretary next supports his inferences with the statement that "The record reveals that plaintiff was the owner of sufficient real estate to provide him with substantial income from rentals during the years of his admitted inactivity." The Hearing Examiner would infer from the fact that the plaintiff didn't need the money the conclusion that he did not perform the work. Whether or not the claimant is economically dependent upon his alleged employment is immaterial to the determination of whether a bona fide employment relationship existed. As stated by the court in Millard's Inc. v. United States, 146 F.Supp. 385 (D.C.N.J.1956):

2. According to affidavit of Richard Conroy, he replaced Donald as Assistant Manager of George's properties and discharged the same duties as Donald had for a slightly higher wage.

"Moreover, the Act is not to be understood, as it often previously had been understood, to define, 'an employee' as 'an individual in a service relationship, who is dependent as a matter of economic reality upon the business to which he renders service, and not upon his own business as an independent contractor.' This latter has now been definitely discredited by the Congress itself, as not being the intent of the Act." (p. 388).

The Secretary next suggests that, because all payments from Donald were made in cash and there is no record of their actually being made, these payments were never actually made. The record indicates (Tr. 194) that Donald paid all of his employees in cash, yet the Examiner is still suspicious of cash payments to the claimant. And the Hearing Examiner has also decided to ignore the payroll records which Donald kept showing the monthly payment to the claimant and the regular withholding of income tax and the regular contribution to the Social Security fund.

At this point the Court acknowledges that we have submitted alternative inferences which can be drawn from the documentary evidence upon which the Hearing Examiner based his recommendations. Of course, a court is ordinarily not permitted to do so. Moon v. Celebrezze, supra. We offer these only as a demonstration that other reasonable inferences, contrary to those of the Hearing Examiner, can easily be drawn from these documents. We admit that the inferences of the Hearing Examiner, drawn from these documents alone, are permissible and reasonable. If this were the extent of the evidence in this case, we would thus be precluded from substituting our own judgment for that of the Secretary. But the state of the whole record in this case compels us to reject the Secretary's decision as conjectural and speculative. Viewed against the sworn testimony of seven witnesses, uncontroverted, unassailed and unshaken, the inferences of the Hearing Examiner become impermissible and unreasonable.

The Secretary insists that the Hearing Examiner's decision as to the credibility of the witnesses is final and he is entitled to disbelieve all of the testimony of the claimant and his two stepsons. Accordingly, it is argued that the Court is now precluded from using that testimony in determining whether the evidence substantially supports the Secretary's decision. For this we are cited to Larmay v. Hobby, 132 F.Supp. 738 (E.D.Wisc.1955), a case where a widow was denied benefits because a hearing examiner found that she had not been living with her husband at the time of his death although she had testified that they had been living together at that time. The record there, however, indicated several instances where she had admitted that she had been separated from her husband at the time of his demise.

"True, she finally testified differently. This is a situation in which the trier of facts could apply the rule *Falsus in uno, falsus in omnibus,* and could disbelieve all of her testimony except such as is corroborated by other credible testimony." (p. 740)

In the instant case, however, we have no conflict or inconsistency between the plaintiff's testimony and any other testimony. On the contrary, all three witnesses before the Hearing Examiner told the same story, yet the Secretary totally rejects all their testimony on the ground that he alone could see and hear them. We have combed the 397 page record as, no doubt, have the Secretary's battery of legal advisers, and have found no material inconsistency in the testimony of any witness. Our experience teaches us that the fabricating witness is susceptible of mistakes because he has no frame of reference in reality from which he relates his story. The witness who is relating the truth, on the other hand, has only to remember what events happened in fact, not what prevarication he created in his own mind. Yet the Secretary cannot point to a single slip-up, a single instance where the testimony of those witnesses is in conflict.

In addition to the three witnesses, the claimant introduced at the hearing four affidavits in support of his allegations, but the Hearing Examiner summarily dismissed all of them for varying reasons. The affiants are: Henry Reeves, who worked, with the claimant, for George Giancarli; Betty Cassidy, another employee of George Giancarli at his restaurant next to the studio; Richard L. Conroy, another employee of George Giancarli, who assumed Donald Eastman's duties when Donald returned full time to his photography business; and Frank Maglione, whose business establishment is next door to Donald's studio.

Henry Reeves was the daytime attendant at George Giancarli's parking lot who was relieved by the claimant at 5 o'clock every day. The Secretary dismisses Mr. Reeves' sworn statement because he never actually saw the claimant in the performance of his duties. Of course, the Secretary assumed this, but did not call Mr. Reeves before the Hearing Examiner to so testify. In view of this fact, we think the summary dismissal of the affiant's statements was arbitrary and capricious. How can the Secretary assume that the first shift man has no personal knowledge that the man who relieves him performs identical duties for the next several hours? Upon returning to work in the morning, one can easily recognize the indicia of work done since his departure of the previous day. Consequently, the Secretary cannot assume that Henry Reeves was without personal knowledge that the claimant performed duties at the parking lot.

Betty Cassidy worked at George Giancarli's restaurant from 1954 through 1962. She stated in her affidavit that the claimant worked for his stepson Donald "in the photofinishing room" from 1956 through the middle of 1959. The Hearing Examiner gave no reason for discrediting her statements but the Secretary, in his brief, argues that she had no opportunity for personal observation of the claimant at work in the building next door. It should not be necessary for the affiant to actually see claimant perform his photographic duties before her testimony is given credence. Every woman is aware of what transpires next door. She also testified that Donald Eastman, relieved of some of the responsibilities of the photography business, assisted George Giancarli in managing the restaurant. The Secretary's rejection of this portion of her testimony is indefensible—she certainly knows who her bosses were.

For the past forty years Frank Maglione has owned and operated a business at 315½ South Main Street, which is adjacent to Donald's studio. During that time he was a close friend of the claimant here. His affidavit states that Donald hired James Eastman to do all of the photofinishing in Donald's studio from 1956 through the middle of 1959. The Hearing Examiner offers no reason for his disbelief of Mr. Maglione but in his defense, the Secretary's brief (p. 16) states that the affiant "did not verify any of the details of plaintiff's arrangement with Donald." This is no valid excuse, for there are no "details" which must be proven—it is a simple question of whether the claimant worked for a wage. As we noted, supra, (p. 3) the Act does not contemplate a precise definition of the term "employment." [3]

It is important to note that the Secretary is pointing an accusing finger at these witnesses and affiants. The issue here is very simple—Did the claimant actually perform work for his stepsons? The answer is either Yes or No, and all seven people have answered Yes under oath. Since the question is shorn of any vagueness and free from ambiguity, if

---

3. We need not discuss further the affidavit of Richard Conroy, who replaced Donald Eastman as Assistant Manager of George Giancarli's properties. The sole import of his affidavit is to refute the Secretary's contention that the payment of $4800 per year to Donald from George Giancarli was a mere paper payment. Mr. Conroy was paid $4877.85 in 1962 for the same duties that Donald performed from 1956 through 1959 at $4700 per year.

the witness answers Yes and the answer should be No, he stands defenseless to a charge of perjury. Are all these persons perjurers and only the Secretary's suspicion correct?

The Hearing Examiner inferred that because of the family relationship, all three witnesses at the hearing had an interest in the outcome, and that, therefore, all would lie. But what interest does the parking lot attendant have? What interest does the cashier have? What interest does the Assistant Manager have? What interest does the neighboring businessman have? Yet all are perjurers and only the Secretary's suspicions are correct!

 It is the considered opinion of this Court that the Secretary's decision to reject all the sworn testimony cannot stand. Although his decision on credibility is generally conclusive upon us, there must be some basis in law and in fact for his decision on such an issue. We do not mean to invade the fact-finders' domain and redetermine the issue of credibility, but when the Secretary's decision to completely ignore the sworn testimony of seven people has no basis other than his arbitrary suspicions, we cannot stand idly by. We cannot abdicate our traditional judicial duty to insure that the causes of all supplicants before administrative tribunals are received with an open mind, given a full hearing, and decided in a manner compatible with our fundamental notions of equal justice.

We think in the instant case that the Secretary has relied too heavily upon his own perspicacity and a small portion of the record. As stated by the court in Frazier v. Celebrezze, 236 F.Supp. 938 (E.D.S.C.1965):

> "The Act gives the Secretary the right and the duty to weigh this evidence and to place a reasonable interpretation thereon. Id. It is obvious that the Secretary's decision is based on 'some' evidence, but viewing the 'record as a whole' it is clear that the Secretary's decision is not based upon substantial evidence, and

it appears that undue emphasis has been placed on one portion of the record." (p. 942)

 It is even more reprehensible in this case that the small portion of the record relied upon was submitted and evaluated before the claimant's hearing. The hearing and its result clearly indicate that it was but a mere formality, but that hearing did furnish the plaintiff an opportunity to present evidence upon which we may reverse the Secretary's determination and remand to him, with the direction that he credit the claimant with the benefits prayed for. The record not only indicates that the Secretary's determination is not supported by substantial evidence, but also shows that plaintiff has clearly carried his burden of establishing a right to old age benefits. Therefore, Secretary's Motion for Summary Judgment must be overruled, and plaintiff's Motion for Summary Judgment must be granted. It is so ordered.