## HELVERING, COMMISSIONER OF INTERNAL REVENUE, ET AL. *v.* DAVIS.

No. 910.   Argued May 5, 1937.—Decided May 24, 1937.

*Assistant Attorney General Jackson* and *Mr. Charles E. Wyzanski, Jr.,* with whom *Attorney General Cummings, Solicitor General Reed,* and *Messrs. Sewall Key, A. H. Feller, Arnold Raum, Thomas H. Eliot, Alanson Willcox,* and *Robert P. Bingham,* were on the brief, for petitioners.

*Mr. Edward F. McClennen,* with whom *Mr. Jacob J. Kaplan* was on the brief, for respondent.

628

630

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The Social Security Act (Act of August 14, 1935, c. 531, 49 Stat. 620, 42 U. S. C., c. 7, (Supp.)) is challenged once again.

In *Steward Machine Co.* v. *Davis,* decided this day, *ante,* p. 548, we have upheld the validity of Title IX of the act, imposing an excise upon employers of eight or more. In this case Titles VIII and II are the subject of attack. Title VIII lays another excise upon employers in addition to the one imposed by Title IX (though with different exemptions). It lays a special income tax upon employees to be deducted from their wages and paid by the employers. Title II provides for the payment of Old Age Benefits, and supplies the motive and occasion, in the view of the assailants of the statute, for

the levy of the taxes imposed by Title VIII. The plan of the two titles will now be summarized more fully.

Title VIII, as we have said, lays two different types of tax, an "income tax on employees," and "an excise tax on employers." The income tax on employees is measured by wages paid during the calendar year. § 801. The excise tax on the employer is to be paid "with respect to having individuals in his employ," and, like the tax on employees, is measured by wages. § 804. Neither tax is applicable to certain types of employment, such as agricultural labor, domestic service, service for the national or state governments, and service performed by persons who have attained the age of 65 years. § 811 (b). The two taxes are at the same rate. §§ 801, 804. For the years 1937 to 1939, inclusive, the rate for each tax is fixed at one per cent. Thereafter the rate increases ½ of 1 per cent every three years, until after December 31, 1948, the rate for each tax reaches 3 per cent. *Ibid.* In the computation of wages all remuneration is to be included except so much as is in excess of $3,000 during the calendar year affected. § 811 (a). The income tax on employees is to be collected by the employer, who is to deduct the amount from the wages "as and when paid." § 802 (a). He is indemnified against claims and demands of any person by reason of such payment. *Ibid.* The proceeds of both taxes are to be paid into the Treasury like internal-revenue taxes generally, and are not earmarked in any way. § 807 (a). There are penalties for non-payment. § 807 (c).

Title II has the caption "Federal Old-Age Benefits." The benefits are of two types, first, monthly pensions, and second, lump sum payments, the payments of the second class being relatively few and unimportant.

The first section of this title creates an account in the United States Treasury to be known as the "Old-Age

Reserve Account." § 201. No present appropriation, however, is made to that account. All that the statute does is to authorize appropriations annually thereafter, beginning with the fiscal year which ends June 30, 1937. How large they shall be is not known in advance. The "amount sufficient as an annual premium" to provide for the required payments is "to be determined on a reserve basis in accordance with accepted actuarial principles, and based upon such tables of mortality as the Secretary of the Treasury shall from time to time adopt, and upon an interest rate of 3 per centum per annum compounded annually." § 201 (a). Not a dollar goes into the Account by force of the challenged act alone, unaided by acts to follow.

Section 202 and later sections prescribe the form of benefits. The principal type is a monthly pension payable to a person after he has attained the age of 65. This benefit is available only to one who has worked for at least one day in each of at least five separate years since December 31, 1936, who has earned at least $2,000 since that date, and who is not then receiving wages "with respect to regular employment." §§ 202 (a), (d), 210 (c). The benefits are not to begin before January 1, 1942. § 202 (a). In no event are they to exceed $85 a month. § 202 (b). They are to be measured (subject to that limit) by a percentage of the wages, the percentage decreasing at stated intervals as the wages become higher. § 202 (a). In addition to the monthly benefits, provision is made in certain contingencies for "lump sum payments" of secondary importance. A summary by the Government of the four situations calling for such payments is printed in the margin.[1]

---

[1](1) If through an administrative error or delay a person who is receiving a monthly pension dies before he receives the correct amount, the amount which should have been paid to him is paid in a lump sum to his estate [§ 203 (c)].

This suit is brought by a shareholder of the Edison Electric Illuminating Company of Boston, a Massachusetts corporation, to restrain the corporation from making the payments and deductions called for by the act, which is stated to be void under the Constitution of the United States. The bill tells us that the corporation has decided to obey the statute, that it has reached this decision in the face of the complainant's protests, and that it will make the payments and deductions unless restrained by a decree. The expected consequences are indicated substantially as follows: The deductions from the wages of the employees will produce unrest among them, and will be followed, it is predicted, by demands that wages be increased. If the exactions shall ultimately be held void, the company will have parted with moneys which as a practical matter it will be impossible to recover. Nothing is said in the bill about the promise of indemnity. The prediction is made also that serious consequences will en-

(2) If a person who has earned wages in each of at least five separate years since December 31, 1936, and who has earned in that period more than $2,000, dies *after* attaining the age of 65, but before he has received in monthly pensions an amount equal to $3\frac{1}{2}$ percent of the "wages" paid to him between January 1, 1937, and the time he reaches 65, then there is paid in a lump sum to his estate the difference between said $3\frac{1}{2}$ percent and the total amount paid to him during his life as monthly pensions [§ 203 (b)].

(3) If a person who has earned wages since December 31, 1936, dies *before* attaining the age of 65, then there is paid to his estate $3\frac{1}{2}$ percent of the "wages" paid to him between January 1, 1937, and his death [§ 203 (a)].

(4) If a person has, since December 31, 1936, earned wages in employment covered by Title II, but has attained the age of 65 either without working for at least one day in each of 5 separate years since 1936, or without earning at least $2,000 between January 1, 1937, and the time he attains 65, then there is paid to him [or to his estate, § 204 (b)], a lump sum equal to $3\frac{1}{2}$ percent of the "wages" paid to him between January 1, 1937, and the time he attained 65 [§ 204 (a)].

sue if there is a submission to the excise. The corporation and its shareholders will suffer irreparable loss, and many thousands of dollars will be subtracted from the value of the shares. The prayer is for an injunction and for a declaration that the act is void.

The corporation appeared and answered without raising any issue of fact. Later the United States Commissioner of Internal Revenue and the United States Collector for the District of Massachusetts, petitioners in this court, were allowed to intervene. They moved to strike so much of the bill as has relation to the tax on employees, taking the ground that the employer, not being subject to tax under those provisions, may not challenge their validity, and that the complainant shareholder, whose rights are no greater than those of his corporation, has even less standing to be heard on such a question. The intervening defendants also filed an answer which restated the point raised in the motion to strike, and maintained the validity of Title VIII in all its parts. The District Court held that the tax upon employees was not properly at issue, and that the tax upon employers was constitutional. It thereupon denied the prayer for an injunction, and dismissed the bill. On appeal to the Circuit Court of Appeals for the First Circuit, the decree was reversed, one judge dissenting. 89 F. (2d) 393. The court held that Title II was void as an invasion of powers reserved by the Tenth Amendment to the states or to the people, and that Title II in collapsing carried Title VIII along with it. As an additional reason for invalidating the tax upon employers, the court held that it was not an excise as excises were understood when the Constitution was adopted. Cf. *Davis* v. *Boston & Maine R. Co.*, 89 F. (2d) 368, decided the same day.

A petition for certiorari followed. It was filed by the intervening defendants, the Commissioner and the Collector, and brought two questions, and two only, to our

notice. We were asked to determine: (1) "whether the tax imposed upon employers by § 804 of the Social Security Act is within the power of Congress under the Constitution," and (2) "whether the validity of the tax imposed upon employees by § 801 of the Social Security Act is properly in issue in this case, and if it is, whether that tax is within the power of Congress under the Constitution." The defendant corporation gave notice to the Clerk that it joined in the petition, but it has taken no part in any subsequent proceedings. A writ of certiorari issued.

*First.* Questions as to the remedy invoked by the complainant confront us at the outset.

Was the conduct of the company in resolving to pay the taxes a legitimate exercise of the discretion of the directors? Has petitioner a standing to challenge that resolve in the absence of an adequate showing of irreparable injury? Does the acquiescence of the company in the equitable remedy affect the answer to those questions? Though power may still be ours to take such objections for ourselves, is acquiescence effective to rid us of the duty? Is duty modified still further by the attitude of the Government, its waiver of a defense under § 3224 of the Revised Statutes, its waiver of a defense that the legal remedy is adequate, its earnest request that we determine whether the law shall stand or fall? The writer of this opinion believes that the remedy is ill conceived, that in a controversy such as this a court must refuse to give equitable relief when a cause of action in equity is neither pleaded nor proved, and that the suit for an injunction should be dismissed upon that ground. He thinks this course should be followed in adherence to the general rule that constitutional questions are not to be determined in the absence of strict necessity. In that view he is supported by Mr. Justice Brandeis, Mr. Justice Stone and Mr. Justice Roberts. However, a majority of the

court have reached a different conclusion. They find in this case extraordinary features making it fitting in their judgment to determine whether the benefits and the taxes are valid or invalid. They distinguish *Norman* v. *Consolidated Gas Co.*, 89 F. (2d) 619, recently decided by the Court of Appeals for the Second Circuit, on the ground that in that case, the remedy was challenged by the company and the Government at every stage of the proceeding, thus withdrawing from the court any marginal discretion. The ruling of the majority removes from the case the preliminary objection as to the nature of the remedy which we took of our own motion at the beginning of the argument. Under the compulsion of that ruling, the merits are now here.

*Second.* The scheme of benefits created by the provisions of Title II is not in contravention of the limitations of the Tenth Amendment.

Congress may spend money in aid of the "general welfare." Constitution, Art. I, section 8; *United States* v. *Butler*, 297 U. S. 1, 65; *Steward Machine Co.* v. *Davis, supra.* There have been great statesmen in our history who have stood for other views. We will not resurrect the contest. It is now settled by decision. *United States* v. *Butler, supra.* The conception of the spending power advocated by Hamilton and strongly reinforced by Story has prevailed over that of Madison, which has not been lacking in adherents. Yet difficulties are left when the power is conceded. The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. This is now familiar law.

"When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress." *United States* v. *Butler, supra,* p. 67. Cf. *Cincinnati Soap Co.* v. *United States, ante,* p. 308; *United States* v. *Realty Co.,* 163 U. S. 427, 440; *Head Money Cases,* 112 U. S. 580, 595. Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be interwoven in our day with the well-being of the Nation. What is critical or urgent changes with the times.

The purge of nation-wide calamity that began in 1929 has taught us many lessons. Not the least is the solidarity of interests that may once have seemed to be divided. Unemployment spreads from State to State, the hinterland now settled that in pioneer days gave an avenue of escape. *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 442. Spreading from State to State, unemployment is an ill not particular but general, which may be checked, if Congress so determines, by the resources of the Nation. If this can have been doubtful until now, our ruling today in the case of the *Steward Machine Co., supra,* has set the doubt at rest. But the ill is all one, or at least not greatly different, whether men are thrown out of work because there is no longer work to do or because the disabilities of age make them incapable of doing it. Rescue becomes necessary irrespective of the cause. The hope behind this statute is to save men and women from the rigors of the poor house as well as from the haunting fear that such a lot awaits them when journey's end is near.

Congress did not improvise a judgment when it found that the award of old age benefits would be conducive to the general welfare. The President's Committee on Economic Security made an investigation and report, aided by a research staff of Government officers and employees, and by an Advisory Council and seven other advisory

groups.[2]  Extensive hearings followed before the House Committee on Ways and Means, and the Senate Committee on Finance.[3]  A great mass of evidence was brought together supporting the policy which finds expression in the act.  Among the relevant facts are these: The number of persons in the United States 65 years of age or over is increasing proportionately as well as absolutely.  What is even more important the number of such persons unable to take care of themselves is growing at a threatening pace.  More and more our population is becoming urban and industrial instead of rural and agricultural.[4]  The evidence is impressive that among industrial workers the younger men and women are preferred over the older.[5]  In times of retrenchment the older are commonly the first to go, and even if retained, their wages are likely to be lowered.  The plight of men and women at so low an age as 40 is hard, almost hopeless, when they are driven to seek for reëmployment.  Statistics are in the brief.  A few illustrations will be chosen from many there collected.  In 1930, out of 224 American factories investigated, 71, or almost one third, had fixed maximum hiring age limits; in 4 plants the limit was under 40; in 41 it was under 46.  In the other 153 plants there were no fixed limits, but in practice few were hired if they were over 50 years of age.[6]  With the loss of savings inevitable in periods of idleness,

[2] Report to the President of the Committee on Economic Security, 1935.

[3] Hearings before the House Committee on Ways and Means on H. R. 4120, 74th Congress, 1st session; Hearings before the Senate Committee on Finance on S. 1130, 74th Congress, 1st Session.

[4] See Report of the Committee on Recent Social Trends, 1932, vol. 1, pp. 8, 502; Thompson and Whelpton, Population Trends in the United States, pp. 18, 19.

[5] See the authorities collected at pp. 54–62 of the Government's brief.

[6] Hiring and Separation Methods in American Industry, 35 Monthly Labor Review, pp. 1005, 1009.

the fate of workers over 65, when thrown out of work, is little less than desperate. A recent study of the Social Security Board informs us that "one-fifth of the aged in the United States were receiving old-age assistance, emergency relief, institutional care, employment under the works program, or some other form of aid from public or private funds; two-fifths to one-half were dependent on friends and relatives, one-eighth had some income from earnings; and possibly one-sixth had some savings or property. Approximately three out of four persons 65 or over were probably dependent wholly or partially on others for support." [7] We summarize in the margin the results of other studies by state and national commissions.[8] They point the same way.

---

[7] Economic Insecurity in Old Age (Social Security Board, 1937), p. 15.

[8] The Senate Committee estimated, when investigating the present act, that over one half of the people in the United States over 65 years of age are dependent upon others for support. Senate Report, No. 628, 74th Congress, 1st Session, p. 4. A similar estimate was made in the Report to the President of the Committee on Economic Security, 1935, p. 24.

A Report of the Pennsylvania Commission on Old Age Pensions made in 1919 (p. 108) after a study of 16,281 persons and interviews with more than 3,500 persons 65 years and over showed two fifths with no income but wages and one fourth supported by children; 1.5 per cent had savings and 11.8 per cent had property.

A report on old age pensions by the Massachusetts Commission on Pensions (Senate No. 5, 1925, pp. 41, 52) showed that in 1924 two thirds of those above 65 had, alone or with a spouse, less than $5,000 of property, and one fourth had none. Two thirds of those with less than $5,000 and income of less than $1,000 were dependent in whole or in part on others for support.

A report of the New York State Commission made in 1930 (Legis. Doc. No. 67, 1930, p. 39) showed a condition of total dependency as to 58 per cent of those 65 and over, and 62 per cent of those 70 and over.

The national Government has found in connection with grants to states for old age assistance under another title of the Social Security

The problem is plainly national in area and dimensions. Moreover, laws of the separate states cannot deal with it effectively. Congress, at least, had a basis for that belief. States and local governments are often lacking in the resources that are necessary to finance an adequate program of security for the aged. This is brought out with a wealth of illustration in recent studies of the problem.[9] Apart from the failure of resources, states and local governments are at times reluctant to increase so heavily the burden of taxation to be borne by their residents for fear of placing themselves in a position of economic disadvantage as compared with neighbors or competitors. We have seen this in our study of the problem of unemployment compensation. *Steward Machine Co.* v. *Davis, supra.* A system of old age pensions has special dangers of its own, if put in force in one state and rejected in another. The existence of such a system is a bait to the needy and dependent elsewhere, encouraging them to migrate and seek a haven of repose. Only a power that is national can serve the interests of all.

Whether wisdom or unwisdom resides in the scheme of benefits set forth in Title II, it is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom. Counsel for respondent has recalled to us the virtues of self-reliance and frugality. There is a possibility, he says, that aid from a paternal government

---

Act (Title I) that in February, 1937, 38.8 per cent of all persons over 65 in Colorado received public assistance; in Oklahoma the percentage was 44.1, and in Texas 37.5. In 10 states out of 40 with plans approved by the Social Security Board more than 25 per cent of those over 65 could meet the residence requirements and qualify under a means test and were actually receiving public aid. Economic Insecurity in Old Age, *supra*, p. 15.

[9] Economic Insecurity in Old Age, *supra*, chap. VI, p. 184.

may sap those sturdy virtues and breed a race of weaklings. If Massachusetts so believes and shapes her laws in that conviction, must her breed of sons be changed, he asks, because some other philosophy of government finds favor in the halls of Congress? But the answer is not doubtful. One might ask with equal reason whether the system of protective tariffs is to be set aside at will in one state or another whenever local policy prefers the rule of *laissez faire*. The issue is a closed one. It was fought out long ago.[10] When money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states. So the concept be not arbitrary, the locality must yield. Constitution, Art. VI, Par. 2.

*Third.* Title II being valid, there is no occasion to inquire whether Title VIII would have to fall if Title II were set at naught.

The argument for the respondent is that the provisions of the two titles dovetail in such a way as to justify the conclusion that Congress would have been unwilling to pass one without the other. The argument for petitioners is that the tax moneys are not earmarked, and that Congress is at liberty to spend them as it will. The usual separability clause is embodied in the act. § 1103.

We find it unnecessary to make a choice between the arguments, and so leave the question open.

*Fourth.* The tax upon employers is a valid excise or duty upon the relation of employment.

As to this we need not add to our opinion in *Steward Machine Co. v. Davis, supra,* where we considered a like question in respect of Title IX.

---

[10] IV Channing, History of the United States, p. 404 (South Carolina Nullification); 8 Adams, History of the United States (New England Nullification and the Hartford Convention).

*Fifth.* The tax is not invalid as a result of its exemptions.

Here again the opinion in *Steward Machine Co.* v. *Davis, supra,* says all that need be said.

*Sixth.* The decree of the Court of Appeals should be reversed and that of the District Court affirmed.

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER are of opinion that the provisions of the act here challenged are repugnant to the Tenth Amendment, and that the decree of the Circuit Court of Appeals should be affirmed.