**James W. HARBOLD, Appellant,**

v.

**Elliott RICHARDSON, Secretary of Health, Education and Welfare, Appellee.**

No. 71–1692.

United States Court of Appeals, Third Circuit.

Submitted May 2, 1972.

Decided June 28, 1972.

# 1064

William A. Goyette, McGrath & Dixon, Pittsburgh, Pa., for appellant.

Richard L. Thornburgh, U. S. Atty. and James A. Villanova, Asst. U. S. Atty., Pittsburgh, Pa., Paul Merlin, Chief of Litigation, Henry Eigles, Social Security Division, Office of General Counsel, Dept. of Health, Education and Welfare, for appellee.

Before VAN DUSEN, GIBBONS and JAMES ROSEN, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

Section 223(c) (1) (B) (i) of the Social Security Act, 42 U.S.C. § 423(c) (1) (B) (i) requires that in order to be entitled to disability benefits under the Social Security Act an individual shall have not less than twenty quarters of coverage during the forty quarter period which ends with the quarter containing the month in which he became disabled.

On January 24, 1968, the appellant filed an application for disability insurance benefits under Title II of the Social Security Act. On March 19, 1968 his application was denied because he did not meet the aforementioned earnings requirements.[1] Harbold subsequently requested and was given a hearing which resulted in a second denial of his disability claim. The Appeals Council reviewed the Hearing Examiners' decision and affirmed the denial of benefits. Appellant then took an appeal from the decision of the Appeals Council to the district court. On April 13, 1971 the court below granted the Secretary's motion for summary judgment. This appeal is from that decision.

Appellant's chief complaint is with 42 U.S.C. § 410(a) (7) which excludes service performed in the employ of a State or political subdivision thereof, or any instrumentality of a State or political subdivision from the disability coverage provided in the Act unless the service is included under an agreement pursuant to 42 U.S.C. § 418.[2] Harbold's difficulties stem from the fact that his disability occurred while he was an inmate at the State Correctional Institution at Huntington, Pennsylvania. His incarceration dates back to January, 1962. On November 15, 1967 Harbold became totally blind after consuming a quantity of methyl alcohol. Throughout these proceedings, appellant has vigorously contended that he was an "employee" of the penal institution while incarcerated because he performed work and was subject to the control of the institution. He asserts that because he has been confined in prison since January, 1962, he has been unconstitutionally deprived of coverage with regard to his work activity therein, because such work is not recognized as covered employment; it is

1. Harbold's earnings record reveals that he has 14 quarters of coverage during the 40 quarter period prior to November 15, 1967, when he became blind.

2. § 418. Voluntary agreements for coverage of State and local employees—Purpose of agreement
   (a) (1) The Secretary of Health, Education, and Welfare shall, at the request of any State, enter into an agreement with such State for the purpose of extending the insurance system established by this subchapter to services performed by individuals as employees of such State or any political subdivision thereof. Each such agreement shall contain such provisions, not inconsistent with the provisions of this section, as the State may request.

excluded as such by Sections 210(a) (7) (A) and 218(c) (6) (B) of the Act. Harbold further asserts that he meets the common law test of employee as provided by Section 210(j) of the Social Security Act, 42 U.S.C. § 410(j) for individuals engaged in covered employment.

■ From its inception, the Social Security Act, P.L. 74–241, enacted on August 14, 1935, provided only for limited coverage. The Act was held constitutional in Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937), where the Supreme Court stated:

> "Whether wisdom or unwisdom resides in the scheme of benefits set forth in Title II, it is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here as often is with power, not with wisdom."

It is well settled that Congress does not have to legislate for all in a class of persons because it legislates for part. See Gruenwald v. Gardner, 390 F.2d 591 (2d Cir. 1968), cert. den. 393 U.S. 982, 89 S.Ct. 456, 21 L.Ed.2d 445 (1968). In Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), Justice Stewart dealt with an arbitrary classification argument which was constructed on the basis of the 14th Amendment Equal Protection Clause.[2A]

> "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' * * * 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' * * * 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' * * *" (citations omitted)

Since the Act was originally enacted, Congress has engaged in a series of resolutions and amendments extending the coverage of Title II. The Social Security Amendments of 1950 are the result of Congressional re-evaluation of the entire Title II program. In those amendments, Congress provided coverage for self-employed individuals and state and local employees by contractual agreement but expressly excluded, inter alia, service performed "in a hospital, or penal institution by a patient or inmate thereof" both under federal auspices in Section 410(a) (6) (C) (iii) of 42 U.S.C. and under State Auspices in 42 U.S.C. § 418(c) (6) (B).

■ The Social Security Act is designed to afford protection to working members of the nation's economy who have entered into viable economic relationships. The entire scheme rests on the legislative judgment that those who in their productive years were functioning members of the economy may justly call upon that economy, in their later years, for protection from "the rigors of the poor house," Helvering v. Davis, *supra*, 301 U.S. at p. 641, 57 S.Ct. at p. 909. "But the practical effectuation of that

---

**2A.** In Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), a recipient of social security disability benefits challenged the offset provision of section 224 of the Act, 42 U.S.C. 424a, when his benefits were reduced by the amount of monthly workmen's compensation he was receiving from the State of West Virginia, on the ground that the statutory provision deprived him of the due process of law guaranteed by the Fifth Amendment. In citing *Dandridge*, the court stated:

"While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment." 404 U.S. at 81, 92 S.Ct. at 257.

See also Lofty v. Richardson, 440 F.2d 1144 (6th Cir. 1971), footnote 1 at p. 1147.

judgment has of necessity called forth a highly complex and interrelated statutory structure. Integrated treatment of the manifold specific problems presented by the Social Security program demands more than a generalization." *Flemming v. Nestor*, 363 U.S. 603, 610, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960). The appellant attempts to apply just such a generalization in order to avoid the limited coverage provisions of the Social Security Amendments of 1950. We are unable to say that his status as a prison inmate at the time of his disability constitutes employment either under common law principles or under any permissible statutory construction of the Title II provisions.

■ Harbold would have us "freeze" the earnings period at the point of his imprisonment, so that if he earned coverage prior to incarceration, he would remain covered during his prison term. An obvious incongruity would result from such an application of the law: A claimant would be deemed to have met the earnings requirement of Title II by counting 40 quarters backwards from the date of his incarceration, even though the date of his disability may have occurred several years later, after a prolonged period during which no reportable earnings have been credited to claimant's account by the Secretary. Such a construction would do violence to the specific language of 42 U.S.C. § 423(c) (1) (B) (i).

■ The exemption from coverage of work performed in a penal institution was extensively considered in 1967 by the Congress in conjunction with the initiation of a work release program pursuant to the Prisoner Rehabilitation Law, P.L. 89–176, 18 U.S.C. § 4082. Under this program work is performed outside of the prison for private concerns. Congress specifically recognized the difference between such work and ordinary prison work. The basis for granting coverage to services performed in a work release program was the similarity of that situation to the work situation of ordinary people. In other words, the prisoner does the same kind of work for the same wages under the same circumstances as non-prisoners.[3]

3. The Senate Committee on Finance, in considering the question of whether work performed by an inmate under a work release program should constitute wages for social security purposes, included a provision, Section 124, in H.R. 12080 deleting social security coverage of an inmate of a penal institution who works for a private employer outside the institution while participating in a work release program. Section 124 of H.R. 12080 was later deleted on the floor of the Senate prior to its enactment as P.L. 90–248. The proceedings on the floor of the Senate with respect thereto produced the following dialogue:

"Mr. Ervin. * * * The reason why an inmate who is gainfully employed accrues eligibility for unemployment benefits, or qualifies for social security benefits, or has his employment count as federal service for retirement purposes, is precisely because this man is earning wages and performing exactly the same kind of work that other wage earners perform. * * * It was the intention of the Congress to place the inmate in a normal employment environment so that he would gain work experience, perhaps learn new skills, and be provided an avenue into gainful employment after his release from the institution. In this context, there is no reason to deny the work released inmate any work related benefits to which he is entitled if he were not an inmate of a federal prison. * * *"

   *     *     *     *     *

"Mr. Hruska. The work release program is voluntary. The volunteer is a person who, careful screening indicates, would like to find his place in society. He does this by working on the outside, paying room and board, and supporting his family. * * * There is no reason why this man should be deprived of the benefit of social legislation which protects every other employee. He is paying for it like any other worker. * * * There are two kinds of work: The work which is performed by a prisoner under a work release program and work performed in prison."

See Congressional Record-Senate, November 21, 1967 at p. 33510 et seq.

We conclude that the exclusion of prison work is rationally related to the purpose of the Social Security Act which is to replace loss of support for workers in the national economy, their dependents and survivors.

The judgment of the district court will be affirmed.