Thelma **BECKHAM,** Henrietta Timmons, Sonia Stark, and Lenora Gordon, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

The **NEW YORK CITY HOUSING AUTHORITY;** Joseph J. Christian, as Chairperson of the New York City Housing Authority; Blanca Cedeno and Walter S. Fried, as Members of the New York City Housing Authority, Defendants.

No. 83 Civ. 6003 (RJW).

United States District Court, S.D. New York.

June 26, 1984.

---

Charles E. Williams, III, General Counsel, New York City Housing Authority, New York City, for defendants; A. Joaquin Yordan, New York City, of counsel.

The Legal Aid Society, John E. Kirklin, Director of Litigation, Morton B. Dicker, Attorney-in-Charge, New York City, and The Legal Aid Society, John T. McManus, Attorney-in-Charge, Far Rockaway, N.Y., for plaintiffs; James C. Francis IV, Lynn M. Kelly, Alan Rosner, New York City, of counsel.

ROBERT J. WARD, District Judge.

Plaintiffs commenced this action on behalf of themselves and all other persons similarly situated to challenge a policy of the New York City Housing Authority (the "Authority").[1] Pursuant to that policy, when public housing tenants fail to recertify their income and family composition in a timely manner, the Authority raises the rents of such tenants to one of several maximum rent alternatives more fully described below. Plaintiffs assert that this policy is invalid because it imposes rents in excess of the limits established by the United States Housing Act, 42 U.S.C. § 1401, *et seq.*, (the "Act"), the implementing regulations, and tenant leases; and because it violates plaintiffs' rights under the due process clause of the Fourteenth Amendment.[2] Plaintiffs have moved for partial summary judgment, pursuant to Rule 56(a), Fed.R. Civ.P., on all claims except for their claims for mental and emotional distress and monetary expense. Defendants have cross-moved for summary judgment, pursuant to Rule 56(b), Fed.R.Civ.P. For the reasons hereinafter stated, plaintiffs' motion is granted in part and denied in part, and defendants' cross-motion is denied.

---

1. By Stipulation and Order dated December 22, 1983 (the "Certification Stipulation"), the Court certified the instant action as a class action pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure. According to the Certification Stipulation,

    the class [is] to be comprised of all public housing tenants who have been, are now, or will be charged rents by the New York City Housing Authority that are: (1) the maximum rent based on apartment size, (2) thirty percent of the maximum admission income limit for tenants in federally-subsidized projects, or (3) the HUD-approved market rent based on apartment size, because these tenants allegedly failed to recertify income and/or family composition in a timely manner. The class is hereby certified for purposes of injunctive and declaratory relief as well as claims for reimbursement for allegedly illegal rental changes, but it shall not affect the right, if any, of absent class members to seek compensatory damages in separate litigation.

2. Plaintiffs' statutory challenge to defendants' policy is based on both the substantive legislative provision at issue, 42 U.S.C. § 1437a, and on 42 U.S.C. § 1983. At oral argument, the Court raised the issue of whether there exists a private right of action under § 1437a. *See Stone v. District of Columbia,* 572 F.Supp. 976, 978–80 (D.D.C.1983); *McGhee v. Housing Auth.*

*of Lanett,* 543 F.Supp. 607, 608–10 (M.D.Ala. 1982). After colloquy on this issue, plaintiffs withdrew without prejudice any claim based directly on a private right of action under section 1437a. However, because the policies of the Authority constitute state action for purposes of section 1983, *see Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), plaintiffs' claim that the Authority contravened the maximum rent limitations established by section 1437a presents a cause of action actionable under section 1983. Moreover, as the court explained in *McGhee v. Housing Authority of Lanett, supra,* 543 F.Supp. 607:

    it seems likely that tenants of a public housing authority have a "legitimate claim" that they should receive the benefits of low-cost housing at the rental rate prescribed by Congress. Accordingly, due process protections are "implicated" such that a denial of those protections could give rise to a § 1983 claim that Plaintiff was deprived of her Fourteenth Amendment rights. *Chavez,* supra, at 284. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1343(3) over a § 1983 action to redress the deprivation of the constitutional right to due process. *Id.* at 608 (citing *Chavez v. Sante Fe Housing Auth.,* 606 F.2d 282, 284 (10th Cir.1979) and *Escalera v. New York City Housing Auth.,* 425 F.2d 853, 864 (2d Cir.1970) *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970)).

## BACKGROUND

The Authority owns, operates and manages 275 public housing developments in New York City, providing housing to approximately 500,000 low-income citizens. *See* Affidavit of Raymond Hensen at ¶ 3 (Nov. 23, 1983) ("Hensen Affidavit"). With respect to approximately eighty-five percent (85%) of these developments, the Authority has contracted with the United States Department of Housing and Urban Development ("HUD") for the receipt of operating subsidies, which in 1982 totalled approximately $275,000,000. Such subsidies are conditioned upon annual verification by the Authority of the income and family composition of its tenants, and are designed to offset the expense balance remaining in the Authority's operating budget after the collection of tenant rents.

In June 1980, the Authority established a "maximum" or basic "economic" rent schedule applicable in instances in which tenants failed to timely recertify their incomes and family composition.[3] The rents contained in this schedule were intended to enable the Authority to meet its budgetary demands without the benefit of the federal subsidies that would be withheld for failure to verify tenant income and family composition. From June 1980 until May 1983, the Authority adjusted the rents of those tenants who failed to timely file such recertification forms to conform with the applicable maximum rent established by this schedule. However, in 1981, Congress passed the Omnibus Budget Reconciliation Act, Pub.L. No. 97–35, 95 Stat. 357 (1981) ("OBRA"), the housing provisions of which, *inter alia,* altered and consolidated the rules for computing tenant rent contributions, and increased subsidized housing rent limits to thirty percent (30%) of the tenants' adjusted income.[4] The relevant provision of this statute provides:

### TENANT RENTAL PAYMENTS

Sec. 322. (a) Section 3 of the United States Housing Act of 1937 is amended to read as follows:

### RENTAL PAYMENTS; DEFINITIONS

Sec. 3. (a) Dwelling units assisted under this Act shall be rented only to fami-

---

**3.** This economic rent schedule varied by apartment size as follows:

| Apartment Size | Economic Rent |
| --- | --- |
| Efficiency | $218.00/month |
| 3½ Rooms | $250.00/month |
| 4½ Rooms | $295.00/month |
| 5½ Rooms | $325.00/month |
| 6½ Rooms | $350.00/month |

*See* Hensen Affidavit at ¶ 7.

**4.** Prior to 1969, the Act provided that rents in low income housing projects were to be fixed by local public housing authorities with the approval of HUD. In 1969, Congress enacted Pub.L. No. 91–152, 83 Stat. 379 (1969), which in Title II, Section 213(a) (the "Brooke Amendment") amended section 2(1) of the Act, 42 U.S.C. § 1402(1) to provide that rents in low-income housing "may not exceed one-fourth of the family's income, as defined by the Secretary." This amendment became effective on March 24, 1970. In 1970, Congress further amended section 2(1) of the Act to provide a formula for computing the "family income" to which the twenty-five percent (25%) tenant rent ceiling applied. *See* Pub.L. No. 91–609, Title II, § 208(a), 84 Stat. 1778 (1970). This section of the Act was again amended in 1971 by Pub.L. No. 92–213, § 9, 85 Stat. 776 (1971). This statutory scheme was superseded and omitted from the Act by the general revision in the Housing and Community Development Act of 1974, Pub.L. No. 93–383, Title II, § 201(a)(3), 88 Stat. 654 (1974). ("The rental for any dwelling unit shall not exceed one-fourth of the family's income as defined by the Secretary"). The superseding provisions are contained in 42 U.S.C. § 1437a. Section 1437a has also been repeatedly amended, including Pub.L. No. 96–153, Title II, § 202(a), 93 Stat. 1106 (1979) which provides:

> Sec. 202. (a) Section 3(1) of the United States Housing Act of 1937 is amended by striking out the third sentence and inserting in lieu thereof the following: "The rental for any dwelling unit shall not exceed that portion of the resident family's income which the Secretary establishes on the basis of the relative level of income of the family, but such rental shall not exceed 25 per centum of family income in the case of a very low income family or, in the case of other families, 30 per centum of such income."

This amendment became effective on January 1, 1980 for tenants occupying public housing units after that date. *See also* Pub.L. No. 94–375, § 2(f), 90 Stat. 1068 (1976); Pub.L. No. 95–557, Title II, § 206(c), 92 Stat. 2091 (1978); Pub.L. No. 97–35, Title III, § 322(a), 95 Stat. 400 (1981); Pub.L. No. 98–181, Title II, §§ 202, 206(a)–(c), 97 Stat. 1178, 1179 (1983).

lies who are lower income families at the time of their initial occupancy of such units. A family shall pay as rent for a dwelling unit assisted under this Act the highest of the following amounts, rounded to the nearest dollar:

(1) 30 per centum of the family's monthly adjusted income;

(2) 10 per centum of the family's monthly income; or

(3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

*See Id.* at Title III § 322(a), 95 Stat. 400.[5] A significant effect of the OBRA housing amendments was to establish a uniform formula for computing gross rent applicable to federally-assisted housing programs, thereby voiding the ceiling rents and rent schedules established by the various local housing authorities. Consequently, in July 1982, HUD issued new rules and regulations to guide local housing authorities in effectuating the requirements of the OBRA housing amendments. These regulations eliminated the rent schedules and maximum rents established by the local housing authorities and equalized the rent to be charged to tenants with the same adjusted income, despite differences in their apartment sizes. The Authority implemented these regulations on May 1, 1983. However, it also determined that all tenant households, regardless of income, apartment size, or family composition, would be charged a monthly rent of $561.00 if they failed to annually recertify their income and family composition in a timely manner. This rent is equal to thirty percent (30%) of the maximum income limit for tenants eligible for federally assisted housing, and, thus, corresponds to the highest rent that a new tenant could be required to pay for an authority apartment under the new HUD regulations. *See* Hensen Affidavit at ¶ 15.[6] Such rent increases are generally imposed prior to affording the affected tenants an opportunity to be heard and to demonstrate either that they did, in fact, submit recertification forms within the required deadline or good cause for their failure to do so.[7]

Plaintiffs assert, and defendants agree, that such rent increases are imposed in accordance with a more general policy of the Authority, pursuant to which the Authority raises the rent of tenants who fail to timely recertify income and family composition to either: "(1) the maximum rent based upon apartment size, (2) thirty percent of the maximum admission income limit for tenants in federally subsidized projects, or (3) the HUD-approved market rent based on apartment size." Certification Stipulation at 1. If, subsequent to such rent increase, the affected tenants' income is satisfactorily determined, an interim change is affected so that the tenants' rent accords with the income ultimately reported, and a retroactive credit is given if it is determined that the delay in the timely filing of the recertification forms was not attributable to the tenant. *See* Statement of Material Facts in Support of Defendants' Motion for Summary Judgment at ¶ 6 (Nov. 23, 1983) ("Defendants' Statement").

**5.** This section was recently amended by Pub.L. No. 98–181, Title II, § 206(a), 97 Stat. 1179 (1983), which provides in pertinent part:

AMENDMENTS AFFECTING TENANTS RENTS OR CONTRIBUTIONS

Sec. 206(a) Section 3(a) of the United States Housing Act of 1937 is amended—

(1) by inserting the following immediately after the first sentence: "Reviews of family income shall be made at least annually."; and

(2) by inserting after "under this Act" in the final sentence the following: "(other than a family assisted under [42 U.S.C. § 1437f(o) ] )."

**6.** The maximum income limit for tenants eligible for federally assisted housing is $22,450.00. *Id.*

**7.** In the instant case, the record reveals that the Authority failed to honor the requests of plaintiffs Beckham and Timmons for some form of administrative hearings, even after imposition of their rent increases.

## DISCUSSION

In August 1983, plaintiffs instituted the instant action for declaratory and injunctive relief, as well as damages and attorneys' fees, on behalf of all tenants in public housing owned and operated by the Authority under the provisions of the Act. Defendants in this action are the Authority, its chairman and its board members. Plaintiffs seek judgment on behalf of themselves and all others similarly situated, declaring unlawful and enjoining the Authority's policy and practice of charging tenants rents in excess of the alleged statutory, regulatory and contractual limits. Plaintiffs' challenge to the Authority's policy is based on several independent grounds.

Plaintiffs contend that this policy is invalid because it imposes rents in excess of the limits established in 42 U.S.C. § 1437a and the regulations implementing that section, and because it contravenes the terms of the public housing leases signed by plaintiffs.[8] They further argue that this policy violates their rights under the due process clause of the Fourteenth Amendment both because the policy creates an unconstitutional irrebutable presumption not founded in fact or law, and because the policy authorizes substantial increases of plaintiffs' rents prior to providing plaintiffs with an opportunity to show good cause for their failure to timely recertify income and family composition.

More specifically, plaintiffs seek a permanent injunction enjoining defendants, their successors in office, agents, employees, and other persons in concert with them:

a) From raising the rents of public housing tenants above the limits established by statute, regulation, and lease when tenants allegedly fail to verify income and family composition in [sic] timely manner;

b) To credit all current tenants for excess rent paid above and beyond the statutory, regulatory and contractual limits;

c) To purge the records of all tenants, past and present, of any notation of rent delinquency recorded by virtue of the enforcement of the policy and practice challenged in the complaint;

d) To restore to occupancy of an appropriate housing authority apartment former tenants whose evictions were the result of the enforcement of the policy and practice challenged in the complaint.

e) To pay all former tenants who can be located with due diligence a sum equal to any amount paid as rent in excess of the limits established by statute, regulation, and lease as a result of the policy and practice challenged in the complaint.[9]

Plaintiffs' Notice of Motion for Partial Summary Judgment at ¶ 4. In addition,

---

**8.** The policy and practice of the Authority at issue in this case has resulted in plaintiffs' being charged rents that are well in excess of the statutory limit or thirty percent (30%) of their "family's monthly adjusted income." For example, plaintiff Beckham, whose monthly income totals $312.54, received written notice in April 1982 that her rent was being raised from $82.00 per month to $325.00 per month, the maximum or "economic" rent set by the Authority for apartments of the same size as her's. *See* Affidavit of Thelma Beckham (Aug. 11, 1983); Defendants' Statement at ¶ 2. Similarly, pursuant to the challenged policy, the rents paid by Plaintiffs Timmons and Gordon were raised to $561.00 per month. Timmons, who receives $176.20 per month in income, had previously paid only $62.00 per month as rent. *See* Affidavit of Henrietta Simmons (Aug. 11, 1983); Defendants' Statement at ¶ 3. Gordon had paid rent of only $89.00 per month prior to this increase. She earns a net weekly income of $160.00. *See* Affidavit of Lenora Gordon (Aug.

11, 1983); Defendants' Statement at ¶ 3. Although plaintiff Stark's monthly rent was raised from $165.00 to $325.00, the parties dispute whether this increase was due to her failure to timely file recertification forms or her purported breach of some other provision in her lease. She has a total monthly income of $179.45. *See* Affidavit of Sonia Stark (Aug. 11, 1983); Defendants' Statement at ¶ 4. The Court is careful to observe that the parties' dispute with respect to Stark's rent increase does not raise a genuine issue as to a material fact that would preclude this Court from determining whether plaintiffs or defendants are entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.

**9.** Although the relief sought in this subparagraph is contained in item 4(e) of plaintiffs' motion for partial summary judgment, it is not specifically requested in the prayer portion of the complaint. Nevertheless, because paragraph 5 of that portion of the complaint re-

plaintiffs pray for damages in compensation for mental distress, monetary expense, humiliation and other hardships allegedly suffered by plaintiffs. They also seek attorney's fees and costs pursuant to 42 U.S.C. § 1988.

Plaintiffs now move for partial summary judgment against defendants to secure all the relief requested in their complaint, save damages for mental and emotional distress, monetary expense, costs and fees. Agreeing with plaintiffs that there are no disputed issues of fact to be tried, defendants cross-move for summary judgment. Because this Court holds that the policy at issue violates the tenant rental contributions limits established in section 1437a, the Court finds it unnecessary to reach plaintiff's other claims.

Defendants do not dispute that the Act requires that plaintiffs' rent be set no higher than the limits established in section 1437a. This is not surprising, "since the statutes explicitly require this result, and it is confirmed by the legislative history and HUD's administrative interpretations." *Barber v. White,* 351 F.Supp. 1091, 1095 (D.Conn.1972) (Newman, J.) (footnotes omitted) (construing the Brooke Amendment).[10] The Act sets explicit limits on the rental charges that a public housing authority may impose on tenants. Pursuant to section 1437a of the Act, the maximum rent that may be charged such tenants is the highest of: (1) thirty percent of the family's monthly adjusted income, (2) ten percent of the family's income without adjustments, or (3) for public assistance recipients, the amount of money received as shelter allowance.[11] The implementing regulations enacted by HUD track this statutory scheme. *See* 24 C.F.R. § 860.-404.[12] Neither the regulations nor the stat-

quests that this Court "also grant [plaintiffs] such additional and further relief as to this Court may seem just and proper," all aspects of the relief sought by plaintiffs' motion are properly addressable by this Court.

**10.** *See supra* footnotes 4, 5. *See also* S.Rep. No. 392, 91st Cong., 1st Sess., *reprinted in* 1969 U.S. Code Cong. & Ad.News 1524, 1541–42; Conf. Rep. No. 727, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad.News 2324, 2326; S.Rep. No. 139, 97th Cong., 1st Sess. 232–33, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 528–29.

**11.** Section 1437a reads:
§ 1437a. Rental payments
(a) Families included; amount
Dwelling units assisted under this chapter shall be rented only to families who are lower income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually. A family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(*o*) of this title) the highest of the following amounts, rounded to the nearest dollar:
(1) 30 per centum of the family's monthly adjusted income;
(2) 10 per centum of the family's monthly income; or
(3) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is spe-

cifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

**12.** This regulation provides in pertinent part:
§ 860.404 Computation of gross rent.
(a) *Gross Rent for Families Admitted on or after August 1, 1982.* Gross Rent shall be the highest of the following, rounded to the nearest dollar:
(1) 30 percent of Family Income
(2) 10 percent of the Total Family Income
(3) If the family receives welfare assistance from a public agency and part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph (a)(3) shall be the amount resulting from one application of the percentage.
Section 860.403(f) defines "Family Income" as follows:
(f) *Family income.* Family income means total family income less the following:
(1) A deduction of five percent of total family income, except that the deduction shall be ten percent in the case of an elderly family.
(2) A deduction for extraordinary medical expenses, defined for this purpose to mean medical expenses in excess of three percent of total family income, where not compensated for or covered by insurance.

ute itself provide for any exceptions to the maximum rent limitations that would enable a public housing authority to raise tenants' rents above the limits imposed by section 1437a.

■ Plaintiffs contend that the Authority's policy of unilaterally increasing the rents of tenants who fail to timely recertify income and family composition is, in effect, a penalty designed to coerce tenants to comply with the recertification requirements, which charges may not properly be included as rent. The Authority's attempts to collect such rent increases are pro-

scribed both by the express terms of section 1437a and by HUD's implementing regulations. Section 1437a provides that "A family shall pay as rent for a dwelling unit assisted under this chapter ... the highest" of the enumerated alternative amounts. Defendants have not cited and this Court is unaware of any source that would indicate that the maximum rent limitations provided by section 1437a are not absolute and that Congress intended to provide the Authority with the power to increase tenant rents above the limits established by that section. In fact, the legislative history of both section 1437a and for-

(3) A deduction of amounts for unusual occupational expenses not compensated for by the employer, such as special tools and equipment, but only to the extent to which such expenses exceed normal and usual expenses incidental to the type of employment engaged in by the employee.

(4) A deduction of amounts paid by the family for the care of children or sick or incapacitated family members when determined to be necessary to employment of the head or spouse, except that the amount deducted shall not exceed the amount of income received by the family member thus released.

(5) An exemption of the first $300 of the income of a secondary wage-earner who is the spouse of the head of the household.

(6) An exception of $300 for each member of the family residing in the household (other than the head or spouse) who is under eighteen years of age or who is eighteen years of age or older and disabled, handicapped or a full-time student.

(7) An amount equal to the sums received by the head of the household or his spouse from, or under the direction of, any public or private nonprofit child-placing agency for the care and maintenance of one or more persons who are under eighteen years of age and were placed in the household by such agency. No person in the family shall be entitled to more than one exemption.

"Total Family Income" is defined in section 860.403(o) as follows:

(o) Total family income. Total family income means income from all sources of (1) the head of the household and spouse, and (2) each additional member of the family residing in the household who is at least eighteen years of age, anticipated to be received during the twelve months following admission or reexamination of family income, exclusive of the income of full-time students (other than the head or spouse) and income which is temporary, non-recurring or sporadic as de-

fined in this section. Total family income shall include that portion of the income of the head of the household or spouse temporarily absent which, in the determination of the PHA, is (or should be) available to meet the family's needs. Total family income includes, but is not limited to, the following:

(i) The full amount, before any payroll deduction, of wages and salaries, including compensation for overtime and other compensation for personal services (such as commissions, fees, tips, and bonuses).

(ii) Net income from operation of a business or profession (expenditures for business expansion or amortization of capital indebtedness shall not be deducted to determine net income from a business).

(iii) Interest, dividends, and net income of any kind from real or personal property.

(iv) The full amount received from annuities, periodic payments from insurance policies, retirement income, pensions, periodic benefits for disability or death, and other similar types of periodic receipts.

(v) Payments in lieu of earnings, such as unemployment and disability compensation, social security benefits, workmen's compensation and dismissal wages.

(vi) Welfare assistance payments.

(vii) Periodic and determinable allowances, such as alimony and regular contributions or gifts, including amounts received from any persons not residing in the dwelling.

(viii) All regular pay, special payments and allowances (such as longevity, overseas duty, rental allowances, allowances for dependents, etc.), received by a member of the Armed Forces.

(ix) Payments to the head of the household for support of a minor, or payments nominally to a minor for his support but controlled for his benefit by the head of the household or a resident family members other than the head, who is responsible for his support.

mer section 1402(1) reveal that the limits imposed in section 1437a have always been cast in absolute terms, clearly precluding any attempt to read any exception into the

13. As the legislative history of the Brooke Amendment reveals, limitations on the rent contributions of public housing tenants established by federal law were designed to enable even the poorest of families to afford some form of rental housing. As the Senate report explained:

Section 211 of the bill would amend the U.S. Housing Act of 1937 to add a new section 24 which would provide an additional assistance program in behalf of very low-income tenants of public housing projects.

This section would authorize rental assistance payments with respect to units in low-rent housing projects, including low-rent housing in private accommodations, to enable families of very low income to afford rentals with no more than 25 percent of their incomes. Assistance would be in the form of annual payments by the Secretary to public housing agencies pursuant to contracts entered into with the local agencies. Existing as well as new units would qualify for assistance and assistance could be continued for the life of the project as long as it served low-income tenants.

. . . .

This section would enable families, regardless of how low their incomes are, to afford the rentals necessary to support project operating costs with no more than 25 percent of their income. . . .

Although the subsidy was authorized primarily to held families of very low income, the committee intends that it apply to all families who otherwise would be required to pay more than 25 percent of income for rent or who would be barred from public housing because their income was inadequate to pay this rent required; for example, a large family needing a four or five bedroom unit.

. . . .

One of the purposes of this section is to permit improved operating and maintenance services in public housing projects while still permitting occupancy by very low-income tenants. The Secretary would be expected, however, with respect to assistance contracts entered into with local housing agencies, to insure that excessive operating costs, and consequently higher rentals, are not incurred.

S.Rep. No. 392, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 1524, 1541–42. Although Congress raised the tenant rent contribution requirement from twenty-five percent (25%) to thirty percent (30%) in the 1981 OBRA housing amendments, the legislative history reveals no intention on the part of Congress to enable public housing authorities to exceed the rent ceilings established by section 1437a. In fact, the Senate report demonstrates continued

restrictions of section 1437a. *See supra* footnotes 4, 5, 9.[13]

■ Moreover, the regulations implementing this statutory scheme prohibit the congressional sensitivity to the housing needs and financial instability of the poor:

### Tenant Rent Contributions

The Committee has accepted the Administration's recommendations to consolidate and simplify the rules for computing tenant rent contributions and to increase subsidized housing rents to 30 percent of net income. These changes will improve the administrative efficiency of the programs, will reduce the unfairness of similar families paying different rents simply because they are in different HUD programs, and will achieve budget saving necessary to meet reconciliation instructions. Even with the higher rents, subsidized housing tenants will pay a substantially lower percentage of their income for rent than lower-income unsubsidized families pay for housing of generally inferior quality.

The bill simplifies the current rules for tenant contributions by:

adopting a uniform definition of income and net income for all rental assistance programs; requiring annual recertification of all tenants' incomes regardless of the program through which they are assisted;

requiring uniform rules for tenant contributions which, after the new rents are phased up, will increase from 25 percent to 30 percent of adjusted income; and

establishing a more uniform minimum rent schedule thus replacing the current systems for different programs and different types of households.

. . . .

Although current tenants will have difficulty paying higher rents, the Committee believes these changes are necessary and equitable. The complexities of the current system increase administrative costs and contribute to errors in computing tenant rents. The different rent rules and deductions from income create many unfair situations in which similar families pay different rents merely because they are in different programs. In some cases the current rules create the unintended effect of rents that are a larger proportion of the poorest families' incomes than for better-off tenants. During the past decade of rapid inflation, rents for non-subsidized tenants have risen as a percentage of income and will most likely continue to rise; for subsidized renters rents have remained fixed at 25 percent of net income. Over the five year phase-in period, rent increases will average only $3.67 per month each year for Section 8 tenants or $4.38 for public housing tenants. Furthermore, rent increased will be smaller for the poorest tenants (about 10 percent in-

inclusion of miscellaneous charges and penalties as rent. *See* 24 C.F.R. § 860.403(a), (i), (*l*), (p)[14]. For example, charges "for maintenance and repair beyond normal wear and tear and for consumption of excess utilities," as well as penalties for late payments under the lease are distinguished by the regulation from charges for rent, itself. 24 C.F.R. § 866.4(b). Taken together, the statute and the implementing regulations establish a scheme for the assessment of rental charges for tenants in public housing, which scheme expressly proscribes the rent increases challenged by plaintiffs in the instant action. "When the command of a statute is clear, it must be enforced." *Williams v. Pierce*, 708 F.2d 57, 61 (2d Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984) (citing *Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970)). Whatever remedies the Authority may properly invoke to coerce tenants to comply with their statutory and contractual obligations, such as termination of the tenancy after adequate notice and hearing, it may not unilaterally increase tenants' rents above the limits established in section 1437a. Therefore, plaintiffs' motion for partial summary judgment must be granted insofar as it seeks an injunction precluding defendants from raising the rents of public housing tenants above the limits established by section 1437a. However, because there does not currently exist an adequate record to enable this Court to

determine the nature and extent of the further relief, if any, to which plaintiffs might be entitled, the balance of the relief sought by plaintiffs cannot be granted at this time, and to that extent plaintiffs' motion must be denied.

Defendants argue that it was properly within the province of the Authority to promulgate and enforce the policy and practice at issue in this case. Citing N.Y. Pub.Hous.Law § 154, they assert that under state law the power to fix rents in a public housing project rests exclusively with the Authority. Moreover, they observe, state law also grants the Authority the power to establish and revise and to make and from time to time amend rules and regulations not inconsistent with state public housing statutes. *See* N.Y.Pub. Hous.Law § 37(1)(K), (W). However, it cannot seriously be urged that rent increases imposed pursuant to state law can be enforced when federal law requires the establishment of a lower rent.

Plainly, the Supremacy Clause requires that federal law prevail. As Justice Cardozo said in upholding the original Social Security Act, "When money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states. So the concept be not arbitrary, the locality must yield." *Helvering v. Davis*, 301 U.S. 619, 645 [57 S.Ct. 904, 910, 81 L.Ed. 1307] (1937). *See also King v. Smith,*

crease in total over 5 years for those below 20 percent of median income) than for better-off tenants (about 24 percent increase for those at 31 to 50 percent of median income).

Tenants moving into subsidized housing will still be helped greatly by the programs even though the 30 percent of net income rent rule becomes effective immediately. In the private market the poorest families with incomes less than 30 percent of median income pay 67.4 percent of income for rent and those families at 31 to 50 percent of median income pay 37.4 percent. The rent rule in this bill will reduce the inequity of providing very large subsidies to very few of the eligible households while the rest receive no subsidy at all.

S.Rep. No. 139, 97th Cong. 1st Sess. 232–33. *Reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 528–29.

**14.** The maximum rent limitations established by section 1437a are also set out in the regulations at 24 C.F.R. § 860.404. That regulation provides for limitations on "gross rent." The term "gross rent" is defined in 24 C.F.R. § 860.403(i) as "contract rent plus the [public housing authority's] estimate of the cost to the tenant of reasonable quantities of utilities ... where such utilities are purchased by the tenant and not included in the contract rent." The term "utilities," as defined in 24 C.F.R. § 860.403(p), "means water, electricity, gas, other heating, refrigeration and cooking fuels, trash collection and sewerage services. Telephone service is not included as a utility." There is no allowance within this regulatory scheme for the assessment of other charges, such as the one imposed by the Authority in the instant case, as "gross rent."

392 U.S. 309, 333, n. 34 [88 S.Ct. 2128, 2141, n. 34, 20 L.Ed.2d 1118] (1968). *Barber v. White, supra,* 351 F.Supp. at 1096. Moreover, the grant to the Authority of the power to fix public housing rents contained in N.Y.Pub.Hous.Law § 154 is expressly "[s]ubject to the terms of any loan or subsidy contract with a government." Defendants readily concede in this action that the Authority's control over policy and practice in public housing projects is subject to the requirements and limitations established by the federal regulatory scheme. As defendants have explained, "the Authority has contracted with [HUD] for the receipt of operating subsidies" and "[t]he payment of these operating subsidies is . . . conditioned upon [annual verification of the income and family composition of public housing tenants], which the Authority must then certify to HUD (42 U.S.C. § 1437 [sic]; 24 CFR § 890.115)." Hensen Affidavit at ¶¶ 3, 5. Thus, even under state law, the Authority's ability to raise the rents of public housing tenants is subject to, and curtailed by federal legislation.

Defendants' reliance on *New York City Housing Auth. v. Shedletsky,* 44 Misc.2d 338, 253 N.Y.S.2d 822 (N.Y.Civ.Ct.1964) and *New York City Housing Auth. v. Stern,* 3 Misc.2d 1007, 159 N.Y.S.2d 500 (N.Y.Mun.Ct.1956) is similarly misplaced. In both of these cases, unlike the situation *sub judice,* the state courts clearly found that the tenants had fraudulently concealed material facts with respect to their income, and that, pursuant to provisions in their leases, they were liable for certain rent surcharges. Moreover, both of these cases were decided prior to Congress' enactment of the maximum rent limitations contained in the Brooke Amendment. Prior to that amendment, rents in public housing projects were fixed by local housing authorities with the approval of HUD. The exercise by local housing authorities of this rather expansive power has been significantly curtailed by recent statutory amendments. *See supra* footnote 4.[15]

Accordingly, plaintiffs' motion for partial summary judgment is granted insofar as it seeks an injunction precluding defendants from raising the rent contributions of public housing tenants above the limits established by section 1437a. In all other respects plaintiffs' motion is denied. Further proceedings in connection with plaintiffs' requests for damages and other relief will be conducted hereafter. Defendants' cross-motion for summary judgment is denied. Discovery in this action is to be completed by September 25, 1984, and a joint pre-trial order is to be submitted by the parties by October 22, 1984.

Settle order on notice.

---

**15.** Moreover, even if the holdings of these two state court cases could be interpreted to apply to the instant context, and even if they were to survive the federal housing legislation of the past two decades, they must still yield to the requirements and restrictions of federal law. *See,* U.S. CONST. Art. VI, § 2; *Barber v. White, supra,* 351 F.Supp. at 1096.

The Authority also relies on the procedures established by HUD's Section 8 New Construction Handbook, *Occupancy Requirements of Subsidized Multifamily Housing Programs,* No. 4350.3 (Nov. 4, 1981). Paragraph 5–7 of that handbook provides in part:

5–7. PENALTIES FOR LATE RESPONSE TO RECERTIFICATION NOTICE. If the Tenant does not supply the requested recertification information within the 10 days specified in the Owner's follow-up notice, paragraph 15a of the model lease agreement authorizes the Owner to: 1) require the Tenant to pay the higher, HUD-approved market rent for the unit; or 2) implement any rent increase re-sulting from the recertification processing without providing the 30 days advance written notice required by paragraph 5–6c of this handbook and paragraph 4 of the model lease. The Owner may implement these penalties only if he/she has complied with the notice requirements of paragraph 5–6 and only in accordance with the time frames discussed below.

However, this handbook governs Section 8 housing programs, which are administered pursuant to 42 U.S.C. § 1437f and which are distinct from the conventional housing programs subject to section 1437a. *See generally* 42 U.S.C. § 1437f; *Wiener v. New York City Housing Auth.,* 106 Misc.2d 843, 435 N.Y.S.2d 642 (N.Y. Civ.Ct.1981) (describing the "Section 8 Program"). In fact Section 8 housing programs are expressly excluded from the maximum rent limitations contained in section 1437a(a). *See* S.Rep. No. 142, 98th Cong., 1st Sess. 34, *reprinted in* 1983 U.S.Code Cong. & Ad.News 1770, 1805.